**Robert TEER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 0578–95.**

Court of Criminal Appeals of Texas, En Banc.

April 24, 1996.

Walter M. Reaves, Jr., West, for appellant.

Beth Toben, Assist. Dist. Atty., Waco, Matthew W. Paul, Assist. State's Attorney, Austin, and Robert A. Huttash, State's Atty., Austin, for the State.

*OPINION ON STATE'S PETITIONS FOR DISCRETIONARY REVIEW*

PER CURIAM.

Appellant was convicted by a jury of aggravated kidnapping and sentenced to forty years imprisonment. The Court of Appeals affirmed appellant's conviction, but reversed the judgment as to punishment. *Teer v. State,* 895 S.W.2d 845 (Tex.App.—Waco 1995). The McLennan County District Attorney and the State Prosecuting Attorney (collectively, "the State") filed petitions for discretionary review which we granted.

---

Upon careful consideration of the grounds for review and the briefs, we conclude that the State's petitions were improvidently granted. Accordingly, the State's petitions for discretionary review are dismissed.

McCORMICK, Presiding Judge, dissenting on State's petition for discretionary review.

This petition was initially granted in order to determine whether the Waco Court of Appeals erred by: (1) failing to analyze whether the victim was in fact "released" before considering whether the release was voluntary and if it was in a safe place; and (2) employing an impermissibly narrow definition of the word "voluntary" in direct conflict with this Court's decisions in *Vernon v. State*, 841 S.W.2d 407 (Tex.Cr.App.1991), and *Tyra v. State*, 897 S.W.2d 796 (Tex.Cr.App. 1995). These issues merit and necessitate discretionary review. *See* Tex.R.App.Pro. 200(c)(1)–(4). The Waco Court not only erred on both of these issues but also mistakenly assumed the role of the proverbial "13th Juror"—re-evaluating the weight and credibility of some of the evidence as well as conspicuously ignoring evidence favorable to the verdict. Because of my belief that the Waco Court of Appeals erred in its opinion, I must dissent to the majority's decision to dismiss this petition as improvidently granted. Allowing such an opinion to remain unaddressed not only fosters disharmony among our intermediate appellate courts but also is a slap in the face to the victims of one of the most insidious forms of violence: domestic abuse.

I.

A.

This case involves the aggravated kidnapping of the appellant's estranged wife, Christina Teer. The appellant married Christina when she was only sixteen years old, on August 8, 1992 (appellant was twenty-one). Following their marriage, Christina dropped out of high school having only completed the tenth grade. She stated she did not think appellant would let her return to school. While living together, Christina had no transportation available to her and there-fore no job. She did work for a short time as a housekeeper for her mother. During this time, she would either walk to her mother's house or appellant would drop her off there. They also moved numerous times, living with several different relatives of the appellant. At the time of the offense, Christina was only seventeen.

Christina tried to separate from appellant on several occasions, each time retreating to her mother's house. On each of these occasions, appellant would locate her there and plead with her until she returned with him. Christina ultimately decided she wanted no further contact with appellant and moved into the Waco Family Abuse Center on September 22, 1993 (at this time, they had been married approximately one year). While Christina lived at the Family Abuse Center, appellant lived at Christina's mother's home and also worked for her mother. Additionally, it was through her mother that appellant learned where Christina was employed, even though Christina did not want him to find her or for anyone to tell him where she was.

In less than one month after the separation, appellant found Christina at her place of employment. Christina had begun working as a waitress at Shooters, a Waco billiards hall, on October 3, 1993. On October 13, 1993, at approximately 5:30 p.m., appellant arrived at Shooters carrying a teddy bear and a ring, with the goal of persuading Christina to reconcile their marriage. He waited there for several hours until she arrived at approximately 7:45 p.m. Christina told him that she did not want him there, did not want to talk to him, and did not want to get back together. The manager of Shooters intervened and finally persuaded appellant to leave. Christina was scared and called the Abuse Center. Two of her counselors came to Shooters to check on her.

Appellant soon returned to Shooters, armed with a loaded, Winchester Model 1300, twelve-gauge, pump shotgun. Appellant entered Shooters, racked a round into the chamber of the shotgun, dropped the gun to waist level, pointed it at the crowd, and screamed, "I want everybody down!" Some of the approximately one hundred patrons

laid down, some hid, and the others scattered and began running out the door. Appellant approached Christina, pointed the gun at her, and said, "You are coming with me, bitch." A struggle ensued, and the shotgun discharged into the floor. Appellant grabbed Christina in a headlock and began dragging her towards the door. She wrapped her legs around his legs and they both fell to the floor. Christina tried to push the gun away, but appellant got to it first. He picked it up, pointed it in her face and said, "Get up bitch, or I will shoot you." Christina got up.

He then dragged her by her arm and sweater through the front door where he shoved her to the ground. Appellant walked around to a position in front of Christina, pointed the gun to her face, but said nothing. She stated: "I thought he was going to kill me that time." She begged for her life, continuously repeating "please don't shoot me, I will do anything, just don't shoot me." Appellant then grabbed her by the hair, dragged her to his car, pushed her in, and drove away down Highway Six.[1]

When they reached the town of Riesel, Christina suggested that appellant let her take the car and gun back to Waco, and she would drop him off at his mother's, who lived in Riesel. Appellant responded that "he was not going to jail and that he would kill [her] and himself first before going to jail."

After the abduction, they spent the next three days together at motels in Centerville, Huntsville, and Buffalo. As they were checking into the motel in Centerville, the appellant told Christina to "act normal, don't act scared or anything, don't say anything, and don't run off." Once inside the room, he attempted to take a shower with her, but she refused. When Christina also refused to answer his repeated questions about whether or not she had a boyfriend, appellant acted like he was going to hit her. He then picked up the shotgun and acted like he was going to shoot her, but eventually calmed down.

The next day they drove to Huntsville and checked into another motel. That night, appellant took Christina to the mall. They purchased some makeup and were there approximately forty-five minutes. Later that night back at the motel, Christina was awakened by appellant as he was performing oral sex on her. She tried to push him away from her. She pushed his head back, and told him to stop, but he did not. He then proceeded to have sexual intercourse with her against her will. In her own words, she "just laid there and took it." The next morning appellant left briefly and returned with a can of whipped cream. He took the can, lifted up her shirt, sprayed it on her chest, and began licking it off. Christina covered her head with a pillow, and asked him to "please stop." He eventually did, after commenting that she was "ruining his fun." Later that day, Christina convinced appellant to return the shotgun to Wal–Mart and get his money back. They tried to return the gun, but Wal–Mart would not accept it because it had not been purchased at the Huntsville store.

On the third day, after reaching the motel in Buffalo, appellant had sex with Christina two more times. At some time while they were at the motel, he again became upset with her. Appellant put the shotgun to his head and acted like he was going to shoot himself, until Christina calmed him down. At 6:00 p.m., while watching the evening news, they saw a broadcast concerning the kidnapping and learned that a warrant had been issued for his arrest. After hearing the broadcast, appellant became scared and commanded Christina to call her mother, and get her to drop the charges. He then took her to a pay phone where she called her mother, Mrs. Norma Freeman, and told her she wanted the charges dropped so that she "could go home." Appellant stood directly beside her during this conversation. Christina stated that her mother "acted really calm, like nothing was going on." A short time later, she again called her mother (with appellant standing beside her) and was told that it was all right to come there. They then left Buffalo and headed for her mother's house in Teague.

1. The Court of Appeals bluntly describes this entire sequence by simply stating: "Teer grabbed Christina and forced her to accompany him to his car." *Teer v. State*, 895 S.W.2d 845, 847 (Tex.App.—Waco 1995, pet. granted).

While in route, appellant began discussing his plans for them to get back together and for her to move in with him. When Christina rebuffed him, he slammed on the brakes, and again put the shotgun to his head. Christina then calmed him down by telling him that they would indeed get back together, and they continued on to Teague. Christina stated she did not mean what she had said, but only told him that in order to get "home."

When they arrived at the Freeman residence late that night, her mother ran out and gave appellant a big hug. She told him, "I am so glad you are okay," and continued to embrace him "tightly." Christina described it as "really inappropriate." Once inside the house, Christina's step-dad said nothing to her and ran to the back of the house. Her step-sister ignored her. While Christina slept in the living room on a pallet, appellant and her mother sat on the couch and talked as if nothing had happened. They talked late into the night, discussing appellant and Christina's future plans. Christina never had an opportunity to call the police that night.

The next morning, appellant directed Christina to call the police and ask them if they were going to arrest him and to "make sure everything was okay." She called Detective Mike Alston of the Waco Police Department and told him that she wanted to drop the charges. Christina did not actually want the charges dropped, but was scared to say otherwise because appellant was walking in and out of the room during the conversation with Detective Alston. She made arrangements with the detective for her and appellant to come in the following Monday and to bring the gun with them. During this conversation, Detective Alston carried on a normal conversation with Christina and did not formulate his questions in a "yes or no" type fashion.

Christina then "asked [appellant] if it would be okay" for her to call the Family Abuse Center to let them know that she was all right, and he gave her permission to call them. She spoke with Donna Gregory, her counselor at the Abuse Center. Gregory asked Christina if she was able to talk because her voice was "shaky." She also asked her if she was afraid, if she wanted to leave, if she needed to get out of there, and if she wanted to come back to the Abuse Center. Gregory did formulate her questions so that they could be answered with a "yes or no" type answer, as opposed to a narrative. Christina told her that she was scared and wanted to go "home." "Home" to Christina meant the Waco Family Abuse Center. Gregory then called Detective Alston. He called Christina a second time; this time formulating his questions differently so that they could be answered yes or no. She was able to communicate to him that she wanted to go to the Abuse Center. He told her that some officers would come to arrest appellant and take her back to the abuse center. Detective Alston then called the Freestone County Sheriff's Department and instructed them to go to Freeman's house in Teague and arrest appellant.

At some time that morning, appellant's father and aunt arrived at the Freeman house. Mrs. Freeman and appellant came outside and gave the shotgun to them. The father and aunt then left with the gun and went to Fairfield.

Appellant learned that his arrest was imminent and attempted to leave the premises. He initially drove away and traveled approximately one mile down the road, but returned. He then drove away and returned a second time. After he returned the second time, the Freestone County Sheriff's deputies arrived and arrested him after some initial resistance. As he was being arrested, appellant "fell out on the floor" and lay there, supposedly suffering from a "seizure." He was then put in a patrol car and taken to the Freestone County Sheriff's Department. While en route to Fairfield, appellant managed to open the rear door of the patrol car and attempted to escape. He jumped out of the vehicle as the deputy slowed down, but fell down on the road. He was taken to the Fairfield hospital, examined, released, and then booked.

Christina was scared and upset when the deputies arrived to arrest appellant and she conveyed this fear to them. She told the deputies that she wanted out of that house and wanted to be taken to a safe place. As

appellant was being taken to jail, she was taken to the Freestone County Courthouse were she was reunited with her counselors from the Abuse Center. Christina did not return to her mother's house.

### B.

Appellant was convicted by a jury of aggravated kidnapping. V.T.C.A., Penal Code, Section 20.04(a).[2] After finding that appellant did not voluntarily release Christina alive in a safe place, the jury assessed punishment at 40 years confinement in the Texas Department of Criminal Justice, Institutional Division. *See id.* Section 20.04(b). On appeal, the Tenth Court of Appeals affirmed appellant's conviction, but reversed the judgment as to punishment. *Teer v. State,* 895 S.W.2d 845 (Tex.App.—Waco 1995, pet. granted). The Court of Appeals concluded that the evidence was insufficient to support the jury's finding that Christina was not voluntarily released in a safe place. *Id.* at 851. The McLennan County District Attorney and the State Prosecuting Attorney (collectively, "the State") filed petitions for discretionary review, which we initially granted.

### II.

Our initial inquiry concerns whether the Waco Court of Appeals erred by failing to analyze whether Christina was in fact released before considering whether the release was voluntary and in a safe place. The State contends that the issue of whether the victim was released should have been addressed first. They contend that the evidence was more than sufficient to support a finding that appellant never released Christina and that such a finding would render any subsequent discussion of interpreting "voluntary" moot. Because the State is correct in their contention of the order of analysis as well as the sufficiency of the evidence, I would reverse the judgment of the Court of

Appeals, and affirm the judgment of the trial court.

A person commits aggravated kidnapping if he intentionally or knowingly "abducts" another person, and also has the specific intent to commit one of six other aggravating factors listed by the statute. V.T.C.A., Penal Code, Section 20.04. "Abduct" means to "restrain" a person with the intent to prevent his liberation by: "(A) secreting or holding him in a place where he is not likely to be found: or (B) using or threatening to use deadly force." V.T.C.A., Penal Code, Section 20.01.

"Restrain" means to restrict a person's movements "without consent," so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. *Id.* The restraint is "without consent" if it is accomplished by force, intimidation, or deception. *Id.*

Aggravating kidnapping is classified as a first degree felony. V.T.C.A., Penal Code, Section 20.04. However, if the actor "voluntarily releases" the victim alive and in a safe place, the offense is downgraded to a second degree felony. *Id.*

Whether the defendant voluntarily released the victim alive and in a safe place is an issue of fact for the jury to decide. *Thornburg v. State,* 699 S.W.2d 918, 921 (Tex.App.—Houston [1st Dist.] 1985, no pet.). The defendant has the threshold burden of producing evidence to raise the issue of whether the victim was voluntarily released alive and in a safe place (the burden of production). *Williams v. State,* 851 S.W.2d 282, 286 (Tex.Cr.App.1993).[3] Once the defendant has raised the issue, the State has the burden of proving beyond a reasonable doubt that the defendant did not voluntarily release the victim alive and in a safe place (the burden of persuasion). *Id.; Wright v. State,* 571 S.W.2d 24 (Tex.Cr.App.1978).[4] Therefore, if the State proved that (1) there

---

2. All references to the Penal Code refer to the 1994 version unless otherwise indicated.

3. Although the burden of production is on the accused, evidence raising the issue, and thus meeting that burden, may come from either party. *Williams,* 851 S.W.2d at 286 n. 2.

4. In 1994, the issue of "voluntary release" was designated an affirmative defense by the Legislature, with the burden of persuasion on the defendant by a preponderance of the evidence at the punishment stage. See V.T.C.A., Penal Code, Section 20.04(d) (1995). This change in no way effects the core issues raised by this case.

was no release; or (2) the release, if any, was not voluntary, or (3) the voluntary release, if any, was not in a safe place, then the defendant would not be entitled to be sentenced under the lower grade punishment. The point in time that the release (if any) occurred is critical and must be identified by the appellate court in order to determine if the release was voluntary.

In order to find the appellant guilty of aggravated kidnapping, the jury had to have decided that there was sufficient evidence that he restrained Christina by force, intimidation, or deception. Obviously, in order to be released, the restraint must cease, and therefore, the force, intimidation, or deception must cease.[5] When did this force, and more importantly, when did this intimidation used against Christina cease?

Webster's defines "intimidate" as "to make timid or fearful: FRIGHTEN; *esp:* to compel or deter by or as if by *threats." Merriam Webster's Collegiate Dictionary* 613 (10th ed. 1993). (Emphasis added). It has long been the law in this state that a victim can be restrained by threats alone. From 1857, when our first penal code went into effect, until 1974, the statute specifically stated that one could be "detained by threats." *See* George W. Paschal, *A Digest of the Laws of Texas: Containing the Laws in Force, and The Repealed Laws on which Rights Rest, From 1754 to 1873 Carefully Annotated* 395, 445 (Washington D.C., W.H. & D.H. Morrison, 4th ed. 1873).[6] Article 508 of the Penal Code (Paschal's Digest art. 2169) defined the offense of False Imprisonment as:

"[T]he wilful detention of another against his consent, and where it is not expressly authorized by law, whether such detention be effected by an assault, by actual violence to the person, *by threats,* or by any other means which restrains the party so detained from removing from one place to another as he may see proper." *Id.* at 445.[7] (Emphasis added).

Article 511 set out the necessary requirements of the threat and the circumstances of the victim that were to be considered by the jury. It stated:

"The threat must be such as is calculated to operate upon the person threatened, and inspire a just fear of some injury to his person, reputation, or property, or to the person, reputation, or property of another; and the jury are to consider the age, sex, condition, disposition, or health of the person threatened, in determining whether the threat was sufficient to *intimidate,* and prevent such person from removing beyond the bounds in which he was detained." *Id.* (Emphasis added).

Although this Article was not included in the revised Penal Code of 1974, the areas of inquiry it mandates remain appropriate and our prior case law on that subject is implicitly retained as well. By including "intimidation" as one of the three means of restraining without consent, the current Penal Code continues to recognize that one may be "restrained" by threats alone; that the threat may concern fear of some injury to the victim's person, property, reputation, or the person, property, reputation of another; and

---

5. "Release" is defined as "liberation, discharge, or setting free from restraint or confinement." *Black's Law Dictionary* 1290 (6th ed. 1990).

6. Although the old statute uses "detain," it is synonymous with the currently used "restrain." *Hardie v. State,* 140 Tex.Crim. 368, 144 S.W.2d 571, 575 (Tex.Cr.App.1940). In fact, the 1970 draft of the modern Penal Code continued to use "detain" in defining the offenses of Kidnapping and False Imprisonment, before later substituting "restrain." *State Bar of Texas, Committee on Revision of the Penal Code: Criminal Homicide, Kidnapping and False Imprisonment, Assaultive offenses.* 15–19 (1970).

7. Our current kidnapping statutes are the modern day equivalent of the former false imprisonment statute. Until 1974, the offense of kidnap-

ping concerned only a person being removed from the State or a minor being taken from their parents. *See generally Paschal's Annotated Digest, supra,* at 446; 4 E.T. Branch, *Branch's Annotated Penal Code of Texas With Forms,* 243 (A.R. Stout ed., 2d ed. 1956). In 1931, the Legislature added to the Penal Code Article 1177a, the Kidnapping by Extortion statute, to cover the situations where some sort of ransom was demanded. 4 *Branch's Annotated Penal Code, supra,* at 246. Absent a demand for money or valuable thing, false imprisonment continued to be the equivalent of what today we would call kidnapping or aggravated kidnapping until the modern penal code took effect in 1974.

that the personal characteristics of the victim must be considered.[8]

In *Cortez v. State*, the Thirteenth Court of Appeals acknowledged that threats are one manner in which a victim may be restrained. *Cortez v. State*, 738 S.W.2d 372, 374 (Tex. App.—Corpus Christi 1987, no pet.). They also recognized that with threats, an assailant creates an environment of fear to isolate the victim and prevent the victim from escaping. *Id.* Furthermore, under Texas law the threats need be neither verbal nor express. *Herring v. State*, 3 Tex.Ct.App. 108 (1877); *Maner v. State*, 8 Tex.Ct.App. 361 (1880).[9] The threat may consist of acts, gestures, or the like, which, equally with words, may be calculated to operate upon the person threatened. *Maner*, 8 Tex.Ct.App. at 364. For example, threats may consist of fear inspired by the presence of arms, the angry and menacing manner of the assailant, or a peremptory and threatening demeanor. *Johnson v. State*, 74 Tex.Crim. 179, 194, 167 S.W. 733, 740 (1914).

On appeal, the appellant claimed that there was insufficient evidence to establish that he did not voluntarily release Christina alive and in a safe place. *Teer*, 895 S.W.2d at 848. He asserted that because he took Christina to her mother's house in Teague without being compelled to do so, allowed her to call the authorities and the Family Abuse Center, and left her at the house on at least two occasions, he voluntarily released her. *Id.* The Waco Court apparently assumed Christina was released, either when the appellant took her to her mother's house or when he left and twice returned. Its entire decision is centered around those episodes and whether the "release" was voluntary.

The proper standard of review for assessing the legal sufficiency of the evidence is the familiar one announced in *Jackson v. Virginia:* the evidence must be viewed in the light most favorable to the verdict, to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Furthermore, we review the entire record—all of the record evidence and reasonable inferences therefrom—in assessing evidence sufficiency. *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Cr.App.1994), cert. denied, —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994). It should be emphasized that this standard concedes to appellate courts only a limited role. The inquiry does not require a reviewing court to ask itself whether "it" believes that the evidence at the trial established guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. In this regard, the court is not to position itself as a thirteenth juror in assessing the evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988); *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Cr.App. 1992), cert. denied, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993) (stressing that appellate judges are not factfinders). Rather, it is to position itself as a final, due process safeguard, ensuring only the rationality of the factfinder. *Moreno*, 755 S.W.2d at 867.

Unfortunately, as is so common with judicial axioms, they are often cited, but rarely seriously considered and often given only "lip service." *Id.* That is why this Court in *Moreno* provided appellate courts with this additional admonition:

> "The court is never to make its own myopic determination of guilt from reading the cold record. It is not the reviewing court's duty to disregard, realign, or weigh evidence. This the factfinder has already

---

**8.** It should also be noted that the drafters of the modern Penal Code initially used the words "force, *threat*, or fraud" in rewriting the Kidnapping and False Imprisonment statutes, but later opted for the more inclusive terms "force, *intimidation*, or deception" for the final and current version. *State Bar of Texas, Committee on Revision of the Penal Code, supra.*

**9.** *Cf. U.S. v. Carrion–Caliz*, 944 F.2d 220 (5th Cir.1991), cert. denied, 503 U.S. 965 (1992) (holding that under the Federal Hostage Taking Act, non-physical restraint such as fear or deception can be sufficient to restrain a person against their will); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* Sec. 11, at 49 (5th ed. 1984) (stating that restraint may be by threats of force which *intimidate* the person into compliance, and it is sufficient that the apprehension of force be reasonably understood from the conduct of the defendant, *although no force is used or even expressly threatened* ).

done. The factfinder, best positioned to consider all the evidence firsthand, viewing the valuable and significant demeanor and expression of the witnesses, has reached a verdict beyond a reasonable doubt. Such a verdict must stand unless it is found to be irrational or unsupported by more than a "mere modicum" of the evidence, with such evidence being viewed under the *Jackson* light." *Id.*

Was there sufficient evidence to prove beyond a reasonable doubt that Christina was not released? A thorough examination of the record and the evidence reveals that not only could a rational jury have found that the appellant did not release her, but that a contrary finding would have been irrational.

There is much evidence that is not mentioned in the Appellate Court's decision that is favorable to the verdict (as well as evidence considered by the court, but not favorable to the verdict). Before their separation, the evidence shows Christina Teer was subjected to both economic abuse and isolation by the appellant in an effort to control her— minimal education (during her testimony she did not know the meaning of the words "lobby" or "pending"), no car, no job. She had been subjected to physical violence before the kidnapping. She testified that "[h]e does things, and if I don't reply the way he wants me to, he is going to get violent. . . . A lot of times in our marriage . . . there has been incidents where that has happened."

Christina was only seventeen years old. She attempted to empower herself, financially and educationally, by moving into the Abuse Center, but the appellant tracked her down through her mother. She was drug by the hair from her place of employment, had a shotgun stuck in her face, was threatened with death, forced to beg for her life; all in front of numerous witnesses. She was told by the appellant that he would kill both of them before he would go to jail.

During her three day ordeal, Christina was the victim of emotional and sexual abuse. Her testimony reveals she was sexually assaulted, humiliated, coerced, and repeatedly threatened. While being cross examined about the fact that she had not attempted to escape, she testified that she could not have gotten away with it and that "a lot of my reactions was because I was too scared to do elsewise." The record shows that for three days Christina was continuously subjected to the appellants "good cop, bad cop" routine— affectionate one minute, threatening to shoot her or himself the next.

The record reflects Christina realized that once she had become abducted, overt resistance to the appellant or a failure to comply with his demands would lead to retribution and possible death. She testified that she was "trying to get away by making him trust me." She hoped that through compliance she would eventually make it home. "Home" to Christina was the Abuse Center. She testified that her mother's house was not a safe place to her, but only "one step closer to getting" to the Center. Far from being released when appellant took her to her mother's house, the record shows that in fact she was still a hostage. The reaction of her family when she arrived in Teague could be described as anything but normal. She testified that she thought the appellant would be arrested upon their arrival in Teague. Instead of being met by the authorities, appellant was greeted with a tight "inappropriate" embrace from Christina's mother.

The testimony of Donna Gregory, Detective Alston, Freestone County Sheriff's Captain Whitaker, and Christina herself reveal that her emotional state prior to the appellant's arrest was one of abject fear. Christina told them she was afraid and wanted out of her mother's house. Her voice was "shaky" and she was "upset." Even at trial, she had to be reminded over twenty times to speak up. The record shows that far from being released, Christina was merely returned to a complex web of control and the same entrapping environment from which she was previously unable to escape until she moved into the Family Abuse Center. The appellant continued to use and control her in order to get any criminal charges against him dropped until law enforcement intervened and arrested him.

Whether the intimidation used against Christina had ceased and if she was in fact released turns heavily on the credibility of

the witnesses. The jury is in a far better position to make that determination because it has the distinct advantage of viewing the evidence live; seeing the demeanor and expressions of the witnesses. Appellate judges review cold, one-dimensional records. They are unable to hear a mumbled or trembling voice. They are unable to see a head bowed low, a quivering hand, an averting eye, or a tear stained cheek. Dean Keeton said it best when referring to a person being restrained by threats:

> "This gives rise, in borderline cases, to questions of fact, turning upon the details of the testimony, as to what was reasonably to be understood and implied from the defendant's conduct, tone of voice and the like, which seldom can be reflected fully in an appellate record, and normally are for *the jury*." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* Sec. 11, at 49 (5th ed. 1984). (Emphasis added).

Although this passage references the intentional tort of false imprisonment, the principle is equally and as forcefully applicable in the criminal context. One can be restrained by threats alone, implied or express, and when so, the wiser course is to let the jury (or the trial judge) decide if a release has occurred.

Viewed in the light most favorable to the verdict, the record evidence was plainly sufficient to support the jury's finding that Christina was not voluntarily released. I would hold that not only did the Court of Appeals err by failing to determine whether a release had occurred, but also erred by misapplying the applicable standard of review.

### III.

Assuming arguendo that Christina was in fact released, our next inquiry concerns the proper definition a jury may give to the word "voluntary" in the context of the aggravated kidnapping statute. The Legislature did not define "voluntary" as that term is used in the statute and did not need to. The word "vol-

untary" is a word in common use, its meaning clear and well understood by the ordinary person, and does not generally have such an involved, complicated or special meaning as to require a defining thereof. *Joubert v. State*, 136 Tex.Crim. 219, 124 S.W.2d 368, 369 (1938) (interpreting "voluntarily" in the context of a murder with malice prosecution). When words are not specially defined by the Legislature, they are to be understood as ordinary usage allows, and jurors may freely read the statutory language to have *any* meaning which is acceptable in common speech. *Vernon v. State*, 841 S.W.2d 407, 409 (Tex.Cr.App.1992).[10]

Accordingly, when determining the sufficiency of the evidence to support a jury verdict, reviewing courts must not employ definitions of relevant statutory words which are different or more restrictive than the jurors themselves were legally entitled to use. *Id.* Instead, they must construe the undefined words by opening them to the *broadest possible understanding* in the context of which they are reasonably susceptible in ordinary English. *Tyra v. State*, 897 S.W.2d 796, 797 (Tex.Cr.App.1995).

The Waco Court of Appeals deviated from these common sense rules when it reviewed the sufficiency of the evidence pursuant to a narrow definition of "voluntary." According to the Waco Court, the ordinary meaning of "voluntary" includes exclusively: " 'proceeding from the will or from one's own free choice or consent'; 'done by design or intention'; 'having power of free choice.' " *Teer*, 895 S.W.2d at 849 (citing *Merriam Webster's Collegiate Dictionary* 1324 (10th ed. 1993)). However, they failed to include the following "ordinary meanings" from the same page and same entry in Webster's: "unconstrained by interference" and "acting or done of one's own free will without valuable consideration or legal obligation." *Merriam Webster's Collegiate Dictionary* 1324 (10th ed. 1993). Black's Law Dictionary also defines "voluntary" as: "unimpelled by another's influence"; "resulting from free choice, without

---

**10.** *See* Article 3.01, V.A.C.C.P. ("All words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specially de-

fined."); *see also Joubert*, 124 S.W.2d at 369 (stating that where terms used are simple words, and are used in their ordinary meaning, jurors are presumed to know such common meaning).

compulsion or solicitation"; and "without valuable consideration." *Black's Law Dictionary* 1575 (6th ed. 1990). The American Heritage Dictionary definition of "voluntary" includes "Acting, serving, or done willingly and without constraint or expectation of reward." *The American Heritage College Dictionary* 1513 (3d ed. 1993).[11]

The Ninth Circuit has also acknowledged the necessity to use a broad, inclusive definition of "voluntary" in the context of an aggravated kidnapping statute. *Hennessy v. Goldsmith,* 929 F.2d 511 (9th Cir.1991). In *Hennessy,* the Ninth Circuit was examining a kidnapping statute very similar to ours. Under Arizona law, if a kidnapper "voluntarily releases" his victim, his crime is also reduced to a lower grade felony. Ariz.Rev.Stat.Ann. Sec. 13–1304(B) (1989). The Court stated that " 'Voluntary' in this regard, means 'arising from one's own free will,' or *'acting or done with no external persuasion or compulsion.'* " *Id.* at 517 (*citing* Webster's II New Riverside University Dictionary). (Emphasis added).

It is quite clear that though "voluntary" can be construed narrowly to mean simply intentional or willful action, it can and does have a much broader meaning in common usage. In this broader sense, an act is "voluntary" only if it was the spontaneous product of the actor's free will, uninfluenced by another's persuasion, coercion, or solicitation. Thus, an act may be deemed "involuntary" if the actor's decision to perform the act was the product of or affected by, another's interference, persuasion, influence, or quid pro quo offer.[12]

Under this broader definition of "voluntary," the evidence is plainly sufficient to support the jury's finding. Simply to state this definition is to prove that it cannot apply to either the appellant's behavior as he fled

from his crimes or to his state of mind. A rational trier of fact could have concluded that the appellant would not have released Christina in the absence of the imminent threat of interference by law enforcement. They also could have concluded that appellant would not have released her had she not called her mother in order to have the charges dropped or contacted the Waco Police Department and persuaded them not to arrest him and to drop the charges.

The Court of Appeals adopted its narrow definition of "voluntary" with the purpose of effectuating legislative intent. *Teer,* 895 S.W.2d at 849. However, when attempting to discern legislative intent, the first step is to look to the plain and literal meaning of the text of the statute. *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Cr.App.1991). If the language is clear and unambiguous, it is presumed that the Legislature meant what it said, and courts are not to add or subtract for the wording of the statute. *See id.* Only if the plain meaning of the language leads to an absurd result or if the language is ambiguous should we depart from this maxim and look to extratextual factors in interpreting a statute. *Id.* In this case, allowing the jury to read "voluntary" in the context of its plain meaning, i.e., give to it the broadest possible understanding under *Tyra,* does not lead to an absurd result. In fact, the opposite is true. Limiting the jury to the artificially narrow definition adopted by the Appellate Court leads to an absurd result. Under the Waco Court's definition, as long as the act was the volitional product of the actor's skeletal motor functions, it was "voluntary." Such a narrow and limited definition ultimately guts the word of its commonly understood meaning, and is especially pernicious because the Appellate Court substitutes its narrow definition to overturn a jury verdict

---

**11.** It seems that every dictionary includes a much broader definition of "voluntary" than the Waco Court's. The Oxford Reference Dictionary defines "voluntary" as "acting, done, or given etc. of one's own free will, not under compulsion"; "working or done without payment." *The Oxford Reference Dictionary* 918 (1986). Webster's New Twentieth Century Dictionary also lists "acting without compulsion or persuasion" and "done without profit, payment, or any valuable consideration" as definitions of "voluntary." *Webster's New Twentieth Century Dictionary* 2049 (2d ed. 1983).

**12.** This understanding of "voluntary" is not a unique one in our Penal Code. *See* Renunciation Defense, V.T.C.A., Penal Code, Section 15.04 (stating that renunciation is not "voluntary" if motivated by circumstances not initially present or apparent that increase the probability that the defendant will be detected or apprehended).

supported by overwhelming evidence. In choosing not to define "voluntary release," the Legislature left it to the jury to construe that term according to its common usage—its plain meaning. It is not a reviewing court's function to second-guess the Legislature by imposing an overly narrow definition of a term the Legislature chose not to define. The Court of Appeals thus imposed a definition of "voluntary" which is plainly not the broadest possible definition of that term and plainly not even the most commonly understood definition in direct violation of *Vernon* and *Tyra*.

Instead of focusing their analysis on the proper definition of "voluntary" and explaining their departure from *Vernon* and *Tyra*, the Waco Court embarks on an erroneous interpretation of and an unnecessary refutation of *Wiley v. State*, 820 S.W.2d 401 (Tex. App.—Beaumont 1991, no pet.).[13] This includes framing an unnecessary hypothetical involving standoff between law enforcement officers and a kidnapper. Assuming that a kidnapper would engage in a rational cost benefit analysis during such a standoff as to whether he would prefer to be convicted of a first or second degree felony under the aggravated kidnapping statute, he in fact has every incentive to release his victim unharmed and alive at that point, i.e., capital murder. Regardless, in no sense could such a release at that time be rationally determined to be "voluntary."

In summary, a rational jury could have found beyond a reasonable doubt that Christina Teer was not released by the appellant. Assuming that she was released, in no way could such a release be termed "voluntary" as that word is properly understood. I would therefore also hold that the Court of Appeals used too narrow a definition of "voluntary." Whether the focus be on the issue of release or on voluntariness, this is not an appropriate case to be improvidently granted. Based on the foregoing, I would affirm

13. The Waco Court states that in *Wiley*, the evidence was found sufficient to support the jury's finding that the victim had not been voluntarily released because the victim testified that "he was released only after his captors heard that the police were coming." *Teer*, 895 S.W.2d at 849. This is a total misreading of *Wiley*. Nowhere in

the entire judgment of the trial court and I respectfully dissent.

WHITE, MEYERS and MANSFIELD, JJ., join this dissent

*Wiley* does it make critical the point in time at which the kidnapper learns he is being sought by authorities and nowhere does it conclude the evidence sufficient in that case because the victim was released only after the captors heard that the police were coming.