COURT OF APPEALS












 
 
 
  
 
 
 




COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 


 
 
  
 MEKELI IEREMIA,
  
                             Appellant,
  
 v.
  
  
 THE STATE OF
 TEXAS,
  
                             Appellee.
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
    
  ' 
  
 
 
  
  
                 No. 08-00-00380-CR
  
 Appeal from the
  
 243rd District Court
  
 of El Paso County, Texas 
  
 (TC# 20000D01680) 
  
 
 


O P I N I O N

 

Mekeli Ieremia
appeals his conviction for theft and misapplication of fiduciary property.  We affirm.

Summary of Evidence

Mekeli Ieremia
began working for Socorro Independent School District in October 1991 as
its safety officer.  He was later
promoted to Director of Risk Management under the supervision of Tom Marcee.  As director,
Ieremia was responsible for managing the District=s self-funded workers= compensation fund[1]
and cutting the fund=s costs.








Case management and other cost
containment services were originally performed for the District by Argus
Services Corporation, which charged the District an $8,500 flat fee for
services begun under its contract and an additional $3,500 for each previously
opened claim.  During Ieremia=s tenure, the service provider was
switched from Argus to a company run by Michael Rhinehardt,
who had been with Argus.  The costs of
the services were to remain the same as under the Argus contract.

In November 1998, Nila
Newton joined the District as an internal auditor.  She began aiding the District=s external auditor in gathering
information.  Toward the end of the
external audit, Newton was also given the duty of determining the reasons for
certain variances within accounts between years.

One variance was within the workers= compensation fund.  According to Newton, the expenditures in the
fund increased approximately $2,000,000 from one year to the next.  When Newton questioned Ieremia
about the increase, he told her it was the result of five claims for back
surgeries.  Neither she nor the external
auditors were satisfied with Ieremia=s explanation for the increase in
expenditures, so Newton investigated further.








Newton found that several companies
were being paid large sums of money repetitiously.  Specifically, a total of approximately 4.6
million dollars was paid to the companies. 
Payments to the particular companies continually increased so that they
eventually accounted for 66 percent of the fund=s expenditures, exceeding all of the
fund=s other expenditures.  The reserve available for future expenditures
and liabilities was depleted as a result of the payments.

The majority of the invoices from the
companies in question were in the amount of $3,500, each for an employee
background check.  Specifically, 1,180
such invoices were presented to the District (for which only 1,160 reports were
received).  Newton was suspicious of the
invoices, which all looked very similar although they were from different
companies.  After further investigation,
she discovered that the four companies were all operated by Rhinehardt
and that all of the invoices were signed by Ieremia.

In early February 1999, Don Schulte,
then Assistant Superintendent of Finance, was apprised that Ieremia
was doing background investigations on employees.  Newton drew Schulte=s attention to the large expenditures
and Ieremia was asked about the checks.  According to Schulte, Ieremia
stated that the costs for the investigations were consistent with industry
standards and that the District needed to continue the checks pursuant to a
contract.

Schulte immediately called the FBI
and reported the problem.  Agent Tracy Massington began an investigation into the fund.  Thereafter, the District stopped further
payment to the Rhinehardt companies and placed Ieremia on suspension.

Ieremia resigned on March 24, 1999 by a fax
sent from Hawaii.








Charges were later brought against Ieremia as a result of the investigations.  In the first count, he was indicted for theft
over $200,000 (aggregated).  The
indictment charged that Ieremia exercised control
over United States currency of $200,000 or more from the owner, Don Schulte,
with the intent to deprive the owner of the property.  The property was allegedly obtained in one
scheme and continuing course of conduct. 
In the second count, Ieremia was indicted for
misapplication of fiduciary property of more than $200,000 (aggregated).  The indictment charged that Ieremia, pursuant to one scheme and continuing course of
conduct, beginning approximately January 1, 1997 and continuing until
approximately February 28, 1999, misapplied United States currency that he held
as a fiduciary contrary to an agreement by which he held the property and in a
manner that involved substantial risk of loss to the owner, Don Schulte.

Ieremia filed a motion to quash the
indictment.  A hearing was held on the
motion but no order was entered.  Ieremia eventually pleaded not guilty to both counts.

Trial commenced August 1, 2000.  Several witnesses, including Ieremia, testified. 
At the conclusion of the trial, the jury found Ieremia
guilty on both counts.  The jury assessed
punishment for each count at ten years with a $10,000 fine, the sentences to
run concurrently.

Discussion

Point One:  Motion to Quash

In his first point, appellant argues
that the trial court erred in denying his motion to quash.  He argues that he was thereby deprived of
sufficient notice with which to prepare his defense.








We believe that appellant has waived
his complaint.  In order to preserve a
complaint for appellate review, the complaining party must make a timely,
specific objection and must obtain an adverse ruling from the trial court.[2]  Tex.
R. App. P. 33.1; Turner v. State, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991); Gaines v. State, 789 S.W.2d 926,
927 (Tex. App.--Dallas 1990, no pet.); see also Ramirez v. State, 815
S.W.2d 636, 643 (Tex. Crim. App. 1991) (holding that
error was waived where there was no definite or adverse ruling on a complaint).  In this case, appellant was indicted on April
18, 2000.  On July 24, 2000, a hearing
was held on the motion.  At the
conclusion of the hearing, the judge stated that he would make a decision as
soon as he could.  He advised the parties
that he would send them a letter informing them of his decision.  However, no such letter or appropriate ruling
is within the record.  Nor was there any
further complaint from appellant about the indictments.  At the beginning of the trial on the merits,
after the two counts of the indictment were read in open court, appellant
pleaded not guilty to both counts.

Therefore, we overrule appellant=s first point.

Points Two through Five:  Sufficiency of Evidence

Points Two through Five question the legal and factual sufficiency of the evidence
against appellant for the theft and misapplication offenses.  Appellant argues Points Two and Three
together and Four and Five together.  We
address them similarly.








Theft

Points Two and Three assert that the
evidence is neither legally nor factually sufficient to support the theft
conviction.

On review for legal sufficiency, we
view evidence in the light most favorable to the verdict.  All of the evidence and any reasonable
inferences produced therefrom must be reviewed.  Teer v.
State, 923 S.W.2d 11, 17 (Tex. Crim. App. 1996)
(adopting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.
2781, 2789, 61 L.Ed.2d 560 (1979)).  A
rational trier of fact must have been able to find
the elements of the offense beyond a reasonable doubt.  Id. 
As Williams v. State, 827 S.W.2d 614 (Tex. App.--Houston [1st
Dist.] 1992, pet. ref=d), noted, AIf there is evidence that establishes guilt, beyond a
reasonable doubt, and if the trier of fact believes
that evidence, [the reviewing court] is not in a position to reverse the
judgment on sufficiency of evidence grounds.@ 
Id. at 616.

The reviewing court=s only function is to ensure the
rationality of the fact finder.  Teer, 923 S.W.2d at 17.  The fact finder=s conclusions are given great
deference.  He is better able to make a
determination of credibility, as he has the distinct advantage of viewing the
evidence live and seeing the demeanor and expressions of the witnesses.  Id. at 19.








The first count on which appellant
was indicted was for theft.  A person
commits theft if he Aunlawfully appropriates property with intent to deprive the
owner of property.@  Tex. Penal Code Ann. ' 31.03(a) (Vernon 1994 & Supp. 2002).   Appropriation of property is unlawful where
it is without the owner=s effective consent,
Tex. Penal Code Ann. ' 31.03(b)(1) (Vernon 1994 &
Supp. 2002), as for example where control is induced by deception, Tex. Penal Code Ann. ' 31.01(3)(A)
(Vernon 1994 & Supp. 2002); Hinojosa v. State, 648 S.W.2d 380, 386
(Tex. App.--Austin 1983, pet. ref=d).  Such action may be pursuant to one scheme or
course of conduct.  Tex. Penal Code Ann. ' 31.09 (Vernon 1994).  And even if one only facilitates another=s acquisition of the property, he may
be liable as a party to the offense.  Tex. Penal Code Ann. ' 7.02 (Vernon 1994).

In this case, Schulte, as
superintendent, was properly alleged as the owner of the property.  See Sowders v.
State, 693 S.W.2d 448, 451 (Tex. Crim. App. 1985). 
This issue was not in controversy and appellant does not argue that
Schulte was not the owner.  Rather, he
argues the legal sufficiency of evidence supporting the other elements of
theft.

We believe the evidence was legally
sufficient to support the theft conviction, as Rhinehardt
would not have obtained the money without appellant=s aid.








First, authority to use the Rhinehardt companies was effected by deception.  Scott Irot, the
District=s account executive with its
insurance company, testified that appellant asked him to write various letters
of recommendation.  Initially, the
District was paying Argus a lump sum for services of peer review, private
investigation, and case management. 
Then, appellant told Irot that he liked the
services of a Rhinehardt company and asked Irot to recommend it to the District.  When Irot
questioned appellant about the change, appellant stated the services would be
the same and at the same price, so Irot agreed to
write the recommendation letter.  Later,
a similar letter was written about case management services.[3]

Irot testified that he had given his
approval for the switches only because he believed that the net effects would
be the same.  They were not.  The charges from Rhinehardt
were not the same as they would have been through Argus but were instead much
greater.  Although Argus=s services were seemingly sufficient,
appellant sought transfer of the accounts to Rhinehardt.

There were no contracts between the Rhinehardt companies and the District.  If appellant had wanted to start a program to
perform background checks on all employees, he was aware of the protocol to be
followed to get approval for it. 
However, no such protocol was followed. 
Regardless, appellant authorized continuous payment to Rhinehardt for services. 
Appellant also authorized large payments of money that were not
authorized or approved by the District. 
Appellant=s superiors claimed they had not known of the large
expenditures.  If they had known of the
expenditures, the purchases would not have been authorized.








Appellant was essentially the
ultimate authority for the approval for the expenditures.  Although other individuals gave final
approval for the purchases of the services, as several witnesses testified,
approval was only to the degree invoices complied with District policies and
the law; no one was in a position to question appellant=s authorization.  With appellant=s help, then, Rhinehardt
wrested control of the money.

The services rendered were for
background checks on prospective, current, and resigned or terminated
employees.  When appellant was ultimately
questioned about the expenses, he argued that the services were necessary.  Ben Debellis,
Assistant Superintendent for Personnel, disagreed, stating that the reports
were done at Aan incredible cost@ to the District and were not
needed.  Similarly, Schulte stated that
the routine background checks were already being done and placed within
personnel files.  The District had a
procedure for doing background checks and the duty to perform them was not
within appellant=s realm of responsibilities.

The information contained in the Rhinehardt reports was of no value to the District.  It would be unusual to perform background
checks on all employees.  Schulte
testified that although it would be reasonable to check employees for previous
workers= compensation claims, it would not be
prudent to spend 66 percent of funds on such investigations, as appellant
had.  Other witnesses also acknowledged
that it would be inappropriate to use an applicant=s workers= compensation status against him or
her in making an employment decision. 
Certainly, to do so was not the typical practice.  Regardless, the total amount of the billings
for the services was $4,644,606.57.








There was sufficient evidence to show
that there was an intent to deprive the District of at least $200,000, as the
District was actually deprived of at least that amount.  See Rowland v. State, 744
S.W.2d 610, 612 (Tex. Crim. App. 1988) (holding that
evidence of actual deprivation may itself be evidence of an intent to
deprive).  Agent Massington
analyzed the evidence and found that there were often duplicate background
reports, although the information was obtained on different dates and the
information might not be exactly the same on all of the reports.  Over half a million dollars was expended on
these duplicate reports alone.

Agent Massington
also found that background checks were done on employees that were known to
have workers= compensation claims.  There were no reports for some invoices.  Appellant approved all of the invoices
nonetheless.

The money was deposited in various
bank accounts owned by Rhinehardt.  Agent Massington
contended that almost all of the money in the accounts came from the
District.  Within two months of some of
the companies= incorporation, the District was
receiving bills from them.  The money was
not to be returned, as the approximate amounts of deposits were often withdrawn
shortly thereafter.[4]








Appellant was aware of what services
he should have received from each company. 
Yet, as he testified on cross-examination, he paid the invoices even
when he received the wrong services from a company.  He admitted that he should have gotten
medical case management from one company from which he paid for background
investigation reports.  Similarly, he
paid a company that should have acted as a third-party administrator but that
did investigatory work instead.  In
addition, appellant paid invoices that asked for varying amounts that often
were for much more than the purportedly agreed-upon amounts.

Appellant authorized the invoices,
citing them as necessary and misrepresenting their value.  He caused the District to pay for improper
background checks that, further, were of no value to the District.  In these ways, appellant aided Rhinehardt in its acquisition of the funds.  Thus, viewed in the light most favorable to
the evidence, there is legally sufficient evidence to support appellant=s guilt of the theft.  See Hinojosa, 648 S.W.2d at 386
(holding that evidence was sufficient as a matter of law to support a
conviction for theft where checks falsely certified work done and false
supporting documents were furnished where others relied on these
representations and where payment authorizations would not have been made
without them).

We turn then to a discussion of the
factual sufficiency of the evidence to support the theft offense.








Under a test for factual sufficiency,
the reviewing court analyzes all of the evidence before it.  Unlike with legal sufficiency, the evidence
is not viewed in the light most favorable to the verdict.  Rather, the evidence is assumed to be legally
sufficient and is judged as a whole.  Clewis
v. State, 922 S.W.2d 126, 128, 134 (Tex. Crim.
App. 1996).  The verdict will be
reversed only if it was clearly wrong and unjust.  Id. at 129 (adopting
the standard of review set forth in Stone v. State, 823 S.W.2d 375 (Tex.
App.--Austin 1992, pet. ref=d,
untimely filed)).  It is not
enough that the reviewing court feels that a different result would be more reasonable.  Id. at 135.  If there is some evidence to support the
verdict, the verdict is usually conclusive. 
The reviewing court=s power is only to prevent manifest injustice.  Id.

In support of his argument that the
evidence is factually insufficient to support the theft conviction, appellant
argues that Athe State totally failed to show that
[he received] any money from Michael Rhinehardt as a kickback.@ 
Indeed, the FBI was unable to specifically trace any of the money to
appellant.  But whether appellant
received anything is not germane to our analysis; no such proof was necessary.  See McNeely v. State, 34 S.W.2d 873,
873 (Tex. Crim. App. 1930) (holding that a conviction
for theft may be sustained even where the accused is not found in physical
possession of stolen property).

Notwithstanding, we note that there
was evidence suggesting that appellant received some of the money.  Evidence was presented to show that appellant=s expenditures increased dramatically
during the period in question, although his income did not.  Coincidentally, there was also evidence that Rhinehardt and appellant would fly to and meet briefly in
the Austin airport, the periods before and after which Rhinehardt
would make large withdrawals from his accounts.








Appellant also argues that the State
failed to show the specific amount of loss to the District.  In conjunction, appellant alleges that one
weakness in the State=s case is the fact that the District received a service in
exchange for the money that was spent and that, as he testified at trial, the
reports were of great value to the District. 
The State then failed to prove that the loss to the District was at
least $200,000.

We disagree.  First, we note that the duplicate reports
alone satisfied the $200,000 threshold. 
In addition, there was testimony at trial denying appellant=s assertions of the value of the
reports.

Several witnesses testified that the
reports were of minimal value to the District. 
The $3,500 cost per investigation was an overcharge of great
magnitude.  Clifton Grumbles, Deputy
Director of the Texas Commission on Private Security, testified that $3,500 for
a background investigation would be Aexorbitant.@ 
At most, he would have paid $250 for such an investigation.  Kathleen Becker of Ward North America, the
District=s third-party administrator during
the period of time in question, confirmed this. 
Becker testified that $3,500 was a lot to pay for the investigations and
she said that no one would have paid that amount of money for them.








Appellant attempted to argue that the
information in the reports might be useful. 
For example, a background check on an employee who had resigned might be
useful if the employee returned to the District.  Others testified to the contrary.  Becker testified that she did not believe
there would be any reason to do background checks on all employees and that a
typical risk manager would not perform such an exhaustive investigation.  She also testified that the background checks
would have nothing to do with claims reduction within the plan.  Testimony from Delia Hernandez, also with
Ward, supported Becker=s testimony.  In
addition, Hernandez testified, she would not have paid more in investigative
fees than was paid on medical claims.

Despite appellant=s assertion of the reports= worth, there was evidence that the
reports were valueless.  Even assuming
the reports had some value, that value was, at most, minimal.  The reports were worth no more than 10
percent their actual charge.  There was
factually sufficient evidence of the District=s loss.  The invoices were paid and there was no
discernible intent that the money would be returned.

There was also factually sufficient
evidence of the deception.  At trial,
appellant attempted to argue that he was not the final authority for payment
approval and attempted to blame the scheme on others.  He denied that any deception had been
involved in his handling of the invoices. 
He stated that his superiors were aware of the background checks
procedure and that they authorized it. 
Appellant even testified that Marcee had
instructed him that one of appellant=s duties was pre-employment screening
and that the reports were requested for that purpose.








Although appellant attempted to blame
others for the scheme, his testimony was often contradictory and contradicted
by the testimony of others.  Appellant
never received approval to perform the checks; there was testimony that
appellant=s superiors did not know about the
expenditures prior to the auditor=s attention to them; and none knew of
any program requesting background information on employees.  It was appellant who argued the necessity of
the checks in attempting to convince the others to continue the checks.

There was evidence that continuation
of the checks was of great importance to appellant.  This was consistent with the evidence
suggesting that appellant and Rhinehardt were working
in conjunction.  For instance, a Rhinehardt employee testified that he had picked up his
business cards from appellant.  But it
was appellant=s actions with respect to the Rhinehardt companies and their invoices that were
particularly suspicious.

Many of the Rhinehardt
invoices were for large amounts.  When
appellant was questioned about the payments, he was vague about their
explanation.  He requested that the Rhinehardt checks not be inputted into the automated
computer system but that purchase orders for them be
created manually.  He often took the
invoices to the appropriate department himself and asked that the checks be
expedited.  Finally, he asked that they
be picked up immediately, even calling others to remind them to do so when he
was out of the office.

Appellant also followed a different
protocol for shipment of the checks. 
Although the checks might have been sent by certified mail, they were
instead shipped through the much more costly Fed Ex service.  These procedures were followed only for the
particular Rhinehardt vendors.








Thus, after a neutral review of the
evidence, we believe the evidence was factually sufficient to support the theft
conviction.  We are unconvinced by
appellant=s assertions to the contrary.

We overrule appellant=s second and third points.

Misapplication of Fiduciary Property

Misapplication of fiduciary property
is a felony of the first degree where the value of misapplied property is
$200,000 or more.  Tex. Penal Code Ann. ' 32.45(c)(7)
(Vernon 1994 & Supp. 2002).  The
Penal Code states:  AA person commits an offense if he
intentionally, knowingly, or recklessly misapplies property he holds as a
fiduciary . . . in a manner that involves substantial risk of loss to the owner
of the property or to a person for whose benefit the property is held.@ 
Tex. Penal Code
Ann. ' 32.45(b) (Vernon 1994 & Supp. 2002).

Appellant concedes that he occupied a
position of trust and had a fiduciary responsibility to the District.  However, he argues the State failed to show
that there was an agreement that was violated or that there was a
misapplication of funds.

We find there was evidence of an
agreement between appellant and the District. 
As the Court of Criminal Appeals noted in Bynum v. State, 767
S.W.2d 769 (Tex. Crim. App. 1989), A[A]n agreement is a harmonious
understanding or an arrangement, as between two or more parties, as to a course
of action.@ 
Id. at 777.  Such agreement need not be written.  Id. 
Rather, the Court may apply the commonly understood definition of an
agreement.








It was within appellant=s job responsibilities to take care
of the fund.  Debellis
testified that one of appellant=s functions was to have a good safety program and to have a
program to decrease claims.  Schulte
testified that it was appellant=s responsibility to run the risk management program in
accordance with laws, procedures, and policies. 
Appellant was entrusted with the well-being of the fund.  He helped develop the position he
occupied.  He knew that he was charged
with reducing the amount of claims and making sure that costs were Aput to a minimum.@ 
Thus, all were in agreement about appellant=s intended functions and
restrictions.

The reports that appellant requested
and received were not consistent with his responsibilities.  Almost all of the reports were billed at
$3,500.  The invoices purported to be for
various services, including open medical claims, but virtually all were for background
checks only.  In turn, the background
reports noted prior workers= compensation claims and contained criminal records but while
criminal histories were detailed, workers= compensation claims were merely
listed at the number of claims made; there was nothing more in the reports.[5]  The reports did not contain any other
information that might be useful to appellant in the execution of his duties.








Debellis testified that he thought the
background checks unusual because such checks were being authorized by a
different department for inclusion in each individual=s personnel file.  According to Debellis,
appellant explained that the checks were both normal and necessary, an idea
that Debellis seemed to indicate was without
merit.  Appellant was not responsible for
doing the checks and he never requested approval to do them.

While the $3,500 checks might have
been utilized by appellant, they were unnecessary and their costs were
excessive.  There was no logic in
performing such investigations on all employees.  As we discussed in Points Two and Three, the
reports were shown to be of little value. 
It would be of little benefit to spend a great deal of money researching
an employee in case he or she filed a claim or in case he or she would one day
return to work in the District and then some day subsequent file a claim.  And, as several witnesses testified at trial,
it would be illegal to use the person=s workers= compensation history against him in
an employment decision.

It was appellant=s job, as a fiduciary, to handle the
funds in a manner that would not expose the District to a substantial risk of
loss.  He failed in this task.  As previously discussed, appellant paid for
duplicate reports and paid invoices for which no reports were received.  The record was replete with other evidence of
appellant=s mishandling.








Appellant paid duplicate
invoices.  This was best exemplified by
certain payments to Rhinehardt in September, October,
November, and December 1998.  In
September 1998, a $56,000 fee was paid to Rhinehardt.  On October 20, another check for $56,000 was
authorized to Rhinehardt for the same services for
the month of October.  On October 30, a
$56,000 check was made for the same services for the first two weeks of
November.  Then, on November 20, another
$56,000 was authorized for the last two weeks in November.  On November 11, another $56,000 was
authorized to Rhinehardt for services for the last
two weeks in November.  Finally, on
November 30, a third check for $56,000 was authorized on Rhinehardt=s behalf for the last two weeks in
November.  And, a similar situation
occurred where Rhinehardt was paid twice for the same
period in December.  What began as a
$56,000 per month payment soon became several such payments during the course
of a month.

Appellant paid for the wrong
services.  He authorized bills from case
management services and third-party administrators for investigative work they
did, although the companies were not authorized for such purposes.[6]  There was also testimony that invoices were
inconsistent with services rendered.  At
trial, appellant claimed he paid the invoices, irrespective of who presented
them, because he knew all of the companies were under Rhinehardt=s control.  But, even though appellant understood
changeovers in services to be in name only with no additional costs to the
District, he nevertheless paid invoices for greater or different amounts in the
aggregate of approximately 4.6 million dollars.








And, appellant paid for information
that was inaccurate.  He was confronted
at trial with invoices billing for such information.  Some employees who had made workers= compensation claims were listed as
having no claims.  Some current employees
were listed as having pre-employment background screening reports done.  Additionally, checks were performed on
employees who had left the District.  In
one instance, appellant received a report on an employee listing that she had
no workers= compensation claim, although in the
preceding month he had received an invoice for an open medical background check
on the same employee, indicating that there was an open medical claim.  Later, in October, appellant did a new
employee background check on the same employee. 
Yet, the employee had resigned in January of that year.  As the State showed, appellant authorized
payment of $7,000 in checks on an employee that was not with the District.  And a similar check was performed on Marcee in the month Marcee left
the District.  So, without proper
consideration, appellant allowed payments for improper invoices.[7]

Appellant failed to maintain control
over the fund.  At a minimum, appellant,
who had ultimate power to authorize payment of the invoices, failed to ensure
that the invoices he paid were proper.








The reports that were received were
kept in appellant=s office.  Appellant
never informed the Human Resources division that he already had reports on
individuals for whom they were requesting reports, preventing them from
requesting reports he already had. 
Hernandez testified that the District=s third-party administrator for
claims had not known of such information and that appellant had never precluded
it from seeking other investigative reports, either.  Appellant=s request for reports did nothing to
prevent duplicate reports from being ordered by others, at additional expense
to the fund.

It was appellant=s job to decrease costs to the fund
or at least to keep them in check, a fact to which appellant himself
testified.  Appellant failed in this
responsibility and costs increased under his tenure.  The expenses, for which appellant was responsible,
skyrocketed.  Prior to the expenses, the
account balance had been positive. 
Because of the expenses, the retained earnings (the amount of money for
future expenses and liabilities) was depleted and a
negative balance resulted on the account, negatively impacting other District
programs.

The fund was also negatively impacted
by appellant=s overstatement of the fund
balance.  There was some testimony that
it was also appellant=s responsibility to gather information needed by the
actuaries in determining the amounts to withhold.  Although appellant stated that he did not
have access to the budget, there was evidence to the contrary.  Even if appellant had not gathered the figures
himself, he was the person with ultimate responsibility for them.

Therefore, the evidence was
sufficient that the plan was not run according to agreement.  Property was misapplied in a way that
resulted in not only a substantial risk of loss to the District but an actual
loss.








Appellant cites Aiken v. State,
36 S.W.3d 131 (Tex. App.--Austin 2000, no pet.), an Austin Court of Appeals
case, in arguing that his actions in paying the Rhinehardt
companies to perform investigations did not amount to action toward the
property in a manner that involved a substantial risk of loss.  In that case, Douglas Aiken was convicted of
the offense of misapplication of fiduciary property.  Id. at 131.  Aiken executed a contract on behalf of a
contracting business agreeing that he would build a house for a couple, the Ristaus.  Id. at 132. 
Before the project was completed, Aiken informed the Ristaus
that the company was insolvent and would be unable to finish building the
house.  Id.

Aiken was accused of failing to pay
subcontractors and materialmen pursuant to his
contract with the Ristaus.  Id. 
He was convicted and brought appeal claiming that the evidence was
legally insufficient to support his conviction. 
Id. at 131.  Specifically, he argued that the State failed
to show that he dealt with the owners= property in a manner that involved a
substantial risk of loss.  A portion of
the funds that Aiken had requested were retained in compliance with the
Property Code.  Id.
at 133.  The money, which belonged
to Aiken subject to the claims of the unpaid subcontractors and materialmen, id., was eventually used to pay fully
the subcontractor and materialmen=s claims, id. at 134.  Therefore,
the appellate court agreed with Aiken that the State failed to show that there
had been a substantial risk of loss to the owners.  Id. 
The conviction was reversed.  Id.








In this case, appellant attempts to
argue that because there were other insurance policies in effect during the
time the District=s program was self-funded, there was no substantial risk of
loss to the District.  We disagree.  While it is true that Debellis
testified that after claims per individual reached a certain amount the
insurance company covered a portion of the claims, notwithstanding, the
District=s plan was self-funded and appellant
caused the money to be spent on unnecessary background checks such that the
fund ran into a deficit.  The insurance
company would have paid for some of the claims after they reach a certain level
but the District remained liable through its self-funded program for the other
claims.  Appellant depleted the reserves
from which such claims were to be paid. 
In contrast, in Aiken, the materialmen
and subcontractors were paid completely from the reserves in the bank; the Ristaus were not liable for any more than they had already
paid.  We believe Aiken is
inapplicable to the present situation.

During appellant=s tenure, the fund ran into a
deficit.  Expenditures to Rhinehardt grew from 25 percent of fund expenditures to 66
percent of fund expenditures[8]
two years later.  Although the percentage
of claims went down, this corresponded with an increase in costs of
maintenance; that is, the decrease in percentage of medical claims occurred
while there was an increase elsewhere. 
There was no evidence that appellant=s efforts resulted in a reduction in
claims.

There was legally and factually
sufficient evidence to support the conviction for misapplication of fiduciary
property.  Accordingly, we overrule
appellant=s fourth and fifth points.








Conclusion

Based on the foregoing discussion, we
overrule appellant=s five points and affirm the judgment of the trial court.

 

                                                                        


SUSAN
LARSEN, Justice

August 22, 2002

 

Before Panel No. 4

Barajas, C.J., Larsen, and
McClure, JJ.

 

(Do Not Publish)

 











[1]The
District was originally a subscriber but became self-funded during the time Ieremia worked there.





[2]As
the State correctly notes, appellant=s
motion to quash complained of a charge for theft by a public servant.  The grounds on which he now complains were
first raised at the hearing on the motion to quash.





[3]Appellant
later requested an additional letter recommending another Rhinehardt
company as a third-party administrator but Irot
denied the request.





[4]There
was also testimony to the effect that the balances of the accounts dropped to
zero around the time appellant left the District.





[5]Appellant
testified that the files presented into evidence were incomplete, however.





[6]In
fact, there was testimony that Rhinehardt, which
appellant suggested as a case management service, did not even employ any
medical personnel.





[7]Appellant
attempted to use the inaccuracies to explain the duplicate reports.  He testified that he had requested reports on
individuals for whom he already had reports because of inconsistencies in the
information in different reports.





[8]The
last period in question only ran from September through January (five months).