**In re COMMITMENT of Mohammad Reza KALATI.**

No. 09–11–00285–CV.

Court of Appeals of Texas, Beaumont.

Submitted Jan. 31, 2012.

Decided May 3, 2012.

Kenneth Nash, State Counsel for Offenders, Huntsville, appellant.

Melinda Fletcher, Special Prosecution Unit, Amarillo, for appellee.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

Mohammad Reza Kalati challenges his civil commitment as a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.001–.151 (West 2010 & Supp. 2011) (the SVP statute). Kalati raises nine issues. We hold that the evidence is legally sufficient; however, due to error that occurred during jury selection, we are required to reverse the judgment and remand the case to allow another trial.

### THE STATUTE

Under the SVP statute, the State must prove beyond a reasonable doubt that the person it seeks to commit for treatment is a sexually violent predator. Tex. Health & Safety Code Ann. § 841.062(a) (West 2010). As defined by the Legislature, a sexually violent predator is a person who "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a) (West 2010). Under the statute, a "[b]ehavioral abnormali-ty" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2) (West Supp.2011).

### SUFFICIENCY OF THE EVIDENCE

When these commitment proceedings commenced, Kalati had previously pled guilty to, and had been convicted of, four sexually violent offenses: three offenses of aggravated sexual assault of a child and one offense of indecency with a child. The victims were girls ranging in age from seven to nine. The offenses had occurred over a six-to-seven month time span, while the girls were overnight guests at the Kalati home. The record reveals that, while the girls were in bed, Kalati entered the room and committed the offenses against them. Kalati threatened some of the victims and their families if they told anyone of his actions. Before Kalati completed the sentences he received for having committed these offenses, the State filed a petition seeking Kalati's involuntary civil commitment under Chapter 841 of the Texas Health & Safety Code.

 In issue one, Kalati challenges the legal sufficiency of the evidence to prove beyond a reasonable doubt that his "behavioral abnormality" makes him likely to engage in a predatory act of sexual violence. Kalati argues that the State's experts' testimony—that he is "likely" to reoffend when he gets out of prison—is conclusory, baseless, and insufficient to support a finding that his "behavioral abnormality" makes him likely to engage in a predatory act of sexual violence beyond a reasonable doubt. Because Kalati views the opinion testimony provided in this case as having been wholly conclusory, he concludes that the State failed to prove that

he was likely to reoffend. *See City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex.2009) (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 (Tex.2004)) (noting that opinion testimony that is conclusory or speculative is not relevant evidence because it does not tend to make the existence of a material fact more or less probable); *see also* Tex.R. Evid. 401. Kalati also contends that the experts' data does not validly support the testimony, and that the experts' testimony addressing the likelihood of his committing a future sexually violent offense is not sufficiently precise. Kalati further asserts that the "risk factors" for reoffending relied on by Dr. Dunham and Dr. Arambula are simply "common-sense" factors that the jury could consider on its own without an expert witness's assistance.

With respect to Kalati's argument that the expert testimony is not sufficiently precise, Kalati relies on *Coble v. State,* 330 S.W.3d 253, 279–80 (Tex.Crim.App.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 3030, 180 L.Ed.2d 846, 79 U.S.L.W. 3710 (2011). In *Coble,* the Court of Criminal Appeals held that the trial court erred in admitting the testimony of an expert witness about the defendant's future dangerousness in a capital murder trial without first being given a sufficient foundation to demonstrate that the expert's methodology for predicting future dangerousness was scientifically reliable. *See id.* at 277–79. Nevertheless, the *Coble* Court also expressly reaffirmed "that such expert testimony may, in a particular case, be admissible under Rule 702 and helpful to the jury in a capital murder trial." *Id.* at 275.

In this case, Kalati's challenge concerns testimony given by the State's two experts, Dr. Dunham, a psychologist, and Dr. Arambula, a psychiatrist. Their testimony addressed whether Kalati would likely commit a future act of sexual violence.

During the trial, Dr. Dunham testified that he believed Kalati would likely commit a sex offense after being released from prison. Asked whether "likely" meant Kalati's chance of reoffending was more than fifty percent, Dr. Dunham declined to place a numerical percentage on his projection, stating:

> A. [Dr. Dunham]: You can't put a number on it. It would be unethical. It would be unwise to say this is his percent level for committing a sex offense. It's just—it's not something we can do, actually. So, as a psychologist, I put things in risk categories. I would say he's high risk, and there's a pretty good chance that he's going to do it.

Asked if "it [is] more likely than not that [Kalati] will commit a sex offense when released from prison[,]" Dr. Dunham stated, "I don't know." When asked to express an opinion on the probability that Kalati will reoffend, Dr. Dunham again stated, "I don't know."

Dr. Dunham explained the methodology he followed in evaluating Kalati. According to Dr. Dunham, he reviewed the details of Kalati's offenses, Kalati's prison and medical records, actuarial scores, the diagnoses in the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM–IV*), the Hare Psychopathy Checklist, articles in the field, and he interviewed Kalati. Dr. Dunham uses this data to assess the subject's risk of committing another predatory act of sexual violence. Dunham concluded that in Kalati's case, his risk of reoffending is high.

Dr. Dunham identified a dozen risk factors present in Kalati's case that the scientific literature supports as being associated with an increased risk of recidivism. Those twelve factors include: (1) the violent nature of Kalati's prior offenses, (2) the fact that Kalati's offenses occurred

while he was married, (3) the number of Kalati's victims and their ages, (4) Kalati's lack of empathy or remorse, (5) Kalati's lack of sex offender treatment, (6) Kalati's failure to take responsibility for his offenses, (7) the variety in types of sexual acts that Kalati had perpetrated on the girls, (8) Kalati's use of force or threats against his victims, (9) Kalati's placement of blame on his victims, (10) Kalati's poor appraisal of his own risk, (11) Kalati's denial that he committed the offenses, and (12) Kalati's lack of treatment for pedophilia. Here, in contrast to the facts that were before the Court of Criminal Appeals in *Coble*, the trial court had foundational data to support admitting Dr. Dunham's opinions.

█ Kalati also complains about the lack of precision in Dr. Arambula's assessment of Kalati's risk for committing a future predatory act of sexual violence. According to Dr. Arambula, the term "likely is an assessment of risk," not a prediction. Dr. Arambula testified that "likely" means Kalati "probably would." Like Dr. Dunham, Dr. Arambula employed the *DSM–IV* for his medical diagnosis, interviewed Kalati, and reviewed records of the type of records typically relied on by experts in the field to diagnose a person with pedophilia. The records show the details of the offenses committed by Kalati over a six-to-seven-month period against young girls. Dr. Arambula explained that with respect to his opinions in Kalati's case, he considered risk factors validated by scientific research literature. Based on Kalati's risk factors, Dr. Arambula concluded that Kalati is a "significant risk" to reoffend based on the number of his victims; his return to Iran allegedly to avoid criminal prosecution; his "massive denial" of commission of the offenses; his failure to take responsibility; his lack of treatment; and his lack of remorse. Dr. Arambula also identified factors that he felt were mitigating in Kalati's case, although we note that most of these predate Kalati's commission of the offenses for which he went to prison. The positive factors that mitigated against Kalati committing the underlying offenses included Kalati's family support, a devoted wife and daughter, as well as at the time the offenses were committed, Kalati had friends in the community, a good job, a good income, and no previous criminal history. Dr. Arambula also noted that Kalati has no drug problems, has had no disciplinary cases in prison, and he is educated. Thus, Dr. Arambula also identified specific risk factors that he considered in assessing the risk that Kalati would reoffend.

In our review of the evidence, we also consider whether the jury could reasonably disregard the testimony of Kalati's expert, Dr. Quijano, who appraised Kalati's risk of committing a future predatory act of sexual violence as being low. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817–819 (Tex.2005) (explaining inclusive standard for reviewing evidence in the light favorable to the verdict). First, we note that Dr. Quijano, a psychologist, agreed that Kalati suffered from pedophilia and that pedophilia is a chronic and lifelong condition. Dr. Quijano concluded that Kalati has a behavioral abnormality, and, at one point, stated that Kalati is likely to commit another sex offense. However, Dr. Quijano further explained that he believed the likelihood of Kalati committing another sex offense was very low. Although Dr. Quijano expressed an opinion that contradicts the opinions of the State's experts, jurors are entitled to "choose to believe one witness and disbelieve another." *Id.* at 819.

In summary, the record shows that the State laid a sufficient scientific foundation for the opinions of Dr. Dunham and Dr. Arambula to show that their respective

opinions were neither wholly conclusory nor without a sufficient scientific basis. Each of the State's experts holds a license in his respective field. Each explained the basis of his conclusion that Kalati was likely to engage in a predatory act of sexual violence. The foundations for their respective opinions consist, in part, of Kalati's records, and the records on which the experts all relied are the type of records relied upon by psychiatrists and psychologists. In addition, Dr. Dunham and Dr. Arambula explained that in reaching their respective assessments, they relied on literature and research in the field. Both of the State's experts assessed the likelihood that Kalati would reoffend in accordance with his respective training. Each of the State's experts explained how Kalati's records contributed to the respective expert's opinion, and each of the State's experts presented evidence supporting the opinion that he rendered. We conclude that the opinions of Dr. Dunham and that of Dr. Arambula represent "a reasoned judgment based upon established research and techniques for [their] profession and not the mere *ipse dixit* of a credentialed witness." *In re Commitment of Day*, 342 S.W.3d 193, 204, 206 (Tex.App.-Beaumont 2011, pet. denied). As the sole judge of the credibility of the witnesses and the weight to be given their testimony, the jury may resolve conflicts and contradictions in the evidence by believing all, part, or none of the witnesses' testimony. *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.-Beaumont 2002, pet. denied). In Kalati's case, the jury chose to believe the State's experts, agreeing that Kalati was likely to reoffend.

We also are not persuaded by Kalati's argument that the opinions of the State's experts lack clarity because both experts expressed an opinion using the term "likely," which he asserts is not sufficiently precise. Chapter 841, which employs the term "likely," does not define it and does not require a numerical or percentage statement of whether a person is "likely" to reoffend. Tex. Health & Safety Code Ann. § 841.003(a)(2) (requiring that sexual violent predators have "a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence"); *In re Commitment of Kirsch*, No. 09–08–00004–CV, 2009 WL 2045238, at *6 (Tex.App.-Beaumont Jul. 16, 2009, pet. denied) (mem. op.). We have previously explained that "the testimony of [the experts] is not insufficient merely because the term 'likely' is not defined by the statute or case law." *Kirsch* at *6. " 'When words are not specifically defined by the Legislature, they are to be understood as ordinary usage allows, and jurors may freely read the statutory language to have *any* meaning which is acceptable in common speech.' " *Id.* (quoting *Teer v. State*, 923 S.W.2d 11, 19 (Tex.Crim.App. 1996)). We reject the implication raised by Kalati's argument that the term "likely" has a precise definition of the type associated with any certain assigned percentage of risk.

Here, Dr. Dunham's and Dr. Arambula's explanations of their use of the term "likely" went to the weight a jury might choose to give the testimony. *Id.* (citing *In re Commitment of Gollihar*, 224 S.W.3d 843, 851 (Tex.App.-Beaumont 2007, no pet.)); *see also In re Commitment of Johnson*, No. 09–08–00489–CV, 2009 WL 2973109, at *4 (Tex.App.-Beaumont Sep. 17, 2009, no pet.) (mem. op.) (In testifying that the defendant would likely reoffend, the experts provided an objective assessment of his likelihood of reoffending through actuarial assessment instruments, the *DSM-IV*, the Hare Psychopathy Checklist, the historical records on the defendant, and interviews of the defendant.). It is not necessary that the expert quantify the risk

of reoffending. *See In re Commitment of Chapa*, No. 09–10–00334–CV, 2011 WL 6229426, at *4 (Tex.App.-Beaumont Dec. 15, 2011, no pet.) (mem. op.) (citing *In re Commitment of Johnson*, 2009 WL 2973109, at *4). We conclude that Dr. Dunham's and Dr. Arambula's opinions were not wholly conclusory or speculative and that they offer support for the jury's verdict.

Having considered all of Kalati's legal insufficiency arguments, we hold that the evidence is legally sufficient to support the jury's verdict. Issue one is overruled.

### LIMITATION OF VOIR DIRE

In his third issue, Kalati argues the trial court erred in denying him the "right to ask a proper commitment question regarding pedophilia" during jury voir dire. During voir dire, Kalati's attorney asked the venire:

> [Defense Counsel]: Would anybody on the first row find it hard to give someone who has been diagnosed by an expert as a pedophile a fair trial?
>
> [State]: Objection. It is a commitment question, Your Honor. Getting into a specific diagnosis now.
>
> The Court: Sustained.

A few days before the trial of this case, the Texas Supreme Court provided clear guidance on the scope of permissible voir dire questions in SVP commitment cases. *See In re Commitment of Hill*, 334 S.W.3d 226 (Tex.2011) (per curiam). In *Hill*, counsel asked the potential jurors if they could be fair to a person they believed to be homosexual. *Id.* at 228. After several members of the venire indicated they would not be able to do so, the trial court disallowed further questions about Hill's homosexuality. *Id.* Hill's counsel then attempted to ask the potential jurors whether they would require the State to prove that Hill had a behavioral abnormality that predisposed him to commit sexually violent offenses, or only require the State to prove that Hill had committed two or more sexually violent offenses. *Id.* The trial court sustained the State's objection that the inquiry was an improper commitment question. *Id.*

On appeal to this Court, we relied upon *Hyundai Motor Co. v. Vasquez* to hold that Hill failed to preserve his complaints because counsel had not re-phrased the questions to address the trial court's concerns that Hill's counsel was testing the weight the jury would place on Hill's prior convictions. *See In re Commitment of Hill*, 308 S.W.3d 465, 471, 473 (Tex.App.-Beaumont 2010) (citing *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 749–50 (Tex.2006)). We noted that the trial court did not completely refuse to allow counsel to question the potential jurors about homosexuality, but only stopped counsel when the inquiry concerned giving a fair trial to someone if the homosexual acts involved a child. 308 S.W.3d at 473.

On petition for review, the Supreme Court held that Hill preserved error by asking questions that were proper, and that the trial court abused its discretion by disallowing both lines of inquiry. 334 S.W.3d at 229–30. In *Hill*, the Texas Supreme Court states: "Litigants have the right to question potential jurors to discover biases and to properly use peremptory challenges." *Id.* at 228. Although that right to a complete voir dire examination of the panel is constrained by reasonable trial court control, the proper discretion inquiry turns on the propriety of the question; the trial court abuses its discretion when it denies the right to ask a proper question and that denial either prevents a party from determining whether grounds exist for a challenge for cause or denies intelligent use of that party's peremptory strikes. *Id.* at 228–29. The Texas Su-

preme Court reasoned that "Hill's sexual history was part of the State's proof of his alleged behavioral abnormality, yet the trial court refused questioning that went to the potential jurors' ability to give him a fair trial." *Id.* at 229.

As was the case in *Hill,* Kalati's sexual history was part of the State's proof that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, yet the trial court refused a question that went solely to the potential jurors' ability to give him a fair trial. *Id.* at 229. The substance of the question posed by counsel was probative of the potential jurors' prejudices towards persons diagnosed with pedophilia, and the question that was being posed did not ask the members of the venire for their opinions about the strength of the evidence or suggest what weight they would give to the evidence of Kalati's psychiatric diagnosis. The question concerning Kalati's pedophilia does not significantly differ from the question concerning Hill's homosexuality, as both questions concerned the sexual histories that were part of the State's proof. Because *Hill* is not distinguishable, we conclude the trial court erred by sustaining the State's objection to the question at issue. *Id.* at 229–30.

The State argues that the authorities on this issue are unsettled and confusing, but the State concedes that in SVP cases, the State's experts typically provide the jury with diagnoses of the person on trial and the factors that increase the subject's risk for future offending. The State also concedes that both homosexuality and pedophilia are such factors. The broad language in *Hill* allows counsel to discuss with the jury the subject's sexual history relevant to the subject's behavioral abnormality, so that counsel may discover the

potential juror's biases. *Id.* at 229. The trial court's refusal to allow the question directed at exposing bias or prejudice relating to Kalati's sexual history prevented Kalati from discovering how to best exercise his challenges. *Id.; see also Babcock v. Nw. Mem'l Hosp.,* 767 S.W.2d 705, 709 (Tex.1989).

We cannot distinguish *Hill;* consequently, we apply its holding in this case. We hold that the trial court abused its discretion by denying appellant the opportunity to ask a proper question and that the error harmed the appellant. *See* Tex.R.App. P. 44.1(a). We sustain Kalati's third issue.[1] We reverse the judgment and order of civil commitment and remand the case to the trial court for a new trial.

REVERSED AND REMANDED.

DAVID GAULTNEY, Justice, dissenting.

I respectfully dissent from this Court's ruling on issue three, the voir dire question. Kalati complains the trial court erred in denying him what he describes as the "right to ask a proper commitment question regarding pedophilia" during jury voir dire. He points to the following ruling:

[Defense Counsel]: Would anybody on the first row find it hard to give someone who has been diagnosed by an expert as a pedophile a fair trial?

[State]: Objection. It is a commitment question, Your Honor. Getting into a specific diagnosis now.

The Court: Sustained.

The Texas Supreme Court has given trial courts discretion in distinguishing questions that "test jurors' possible verdicts based on case-specific relevant evidence"

---

1. Because the other issues that Kalati has raised on appeal would not result in greater relief, it is not necessary that we address them. Tex.R.App. P. 47.1.

from those that explore "external biases and unfair prejudices." *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 760 (Tex. 2006). When a question "isolates a single fact material to the case," a trial judge may reason that "the question seeks to identify those jurors who agree that the one fact overcomes all others." *Id.* at 756. Essentially, the question asks about the "strength of this evidence," not about "any external bias or prejudice." *Id.* The Supreme Court explained further in *Vasquez:*

> The Texas Constitution guarantees a trial by a fair and impartial jury, and our courts use voir dire to achieve that goal. Voir dire inquiries that explore external biases and unfair prejudices further the effort, but those that test jurors' possible verdicts based on case-specific relevant evidence detract from it. The distinction between the two in some cases is a fine one. Thus, we vest trial judges with the discretion to decide whether an inquiry constitutes the former or the latter; as appellate courts, we should defer to their judgment.

*Id.* at 760 (footnote omitted). When the voir dire includes a preview of the evidence, "a trial court does not abuse its discretion in refusing to allow questions that seek to determine the weight to be given (or not to be given) a particular fact or set of relevant facts." *Id.* at 753 (footnote omitted).

Kalati nevertheless argues this case presents the same issue the Texas Supreme Court decided in *In re Commitment of Hill*, 334 S.W.3d 226 (Tex.2011). The Supreme Court held in *Hill* that the trial court abused its discretion in preventing defense counsel from asking "whether potential jurors could be fair to a person they believed to be a homosexual." *Id.* at 228. As the Court explained, "Litigants have the right to question potential jurors to discover biases and to properly use

peremptory challenges." *Id.* (citing *Vasquez*, 189 S.W.3d at 749–50). The right is "'constrained by reasonable trial court control.'" *Id.* at 228–29 (quoting *Vasquez*, 189 S.W.3d at 750). Unlike the line of questioning rejected by the trial court in *Hill*, the single question the trial court did not permit in this case isolated an expert's diagnosis. The question was designed to identify the jurors who would give great weight to that diagnosis.

The Supreme Court has held that it is permissible to disclose "the evidence the jury will hear during the case[,]" because allowing the disclosures "increases the potential for discovering external biases, but inquiries to jurors after doing so should not spill over into attempts to preview the verdict based on the facts as represented to the jurors." *Vasquez*, 189 S.W.3d at 755. The question presented here may have been viewed by the trial judge as an effort to preview the effect of the single fact of a diagnosis on the potential jurors; that was the State's objection which the trial court sustained. The Supreme Court noted in *Vasquez:*

> The emphasis of the question is not ameliorated by asking in it whether jurors could be fair and impartial.... [I]f an inquiry suggests that, to be "fair," jurors must not decide the case based on a relevant fact, then a trial court reasonably could conclude that the question seeks a response that reveals nothing about a juror's potential fairness, but instead attempts to guess about his potential verdict.

*Id.* at 757. The trial court could reason that the inquiry here suggested "that, to be 'fair,' jurors must not decide the cased based on" the expert's diagnosis.

Kalati did not attempt to re-phrase the question to change its focus or explain to the trial court why he was entitled to ask the question, and did not ask to rephrase

the question to eliminate the State's "specific diagnosis" objection that the judge sustained. The trial judge did not block a line of questioning. The trial judge "reasonably could conclude that the question seeks a response that reveals nothing about a juror's potential fairness, but instead attempts to guess about his potential verdict." *Id.* at 757. The trial judge refused to allow a single question about an isolated fact based on a principled application of the Supreme Court's reasoning in *Vasquez. See id.* at 760. That was his judgment to make. The standard of review is not *de novo.* We should not second-guess the reasonable exercise of a trial court's discretion in controlling voir dire.