

# NUMBER 13-16-00614-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN RE THE COMMITMENT OF SANTOS GOMEZ III

### On appeal from the 103rd District Court
### of Cameron County, Texas.

## OPINION

### Before Justices Rodriguez, Benavides, and Longoria
### Opinion by Justice Rodriguez

On August 17, 2016, a jury found beyond a reasonable doubt that Santos Gomez III is a sexually violent predator (SVP). *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003(a) (West, Westlaw through 2017 1st C.S.). The district court received the jury's verdict, adjudged Gomez as an SVP, and civilly committed him for sex-offender treatment and supervision. By three issues, Gomez contends: (1)–(2) the evidence is legally and factually insufficient to find that he is an SVP because there was no mental health diagnosis and, if none was required, there was such an analytical gap in the State's

expert's reasoning that a diagnosis recognized by the Diagnostic and Statistical Manual for Mental Disorders, 5th edition (DSM-V) should have been required; and (3) the trial court erred in allowing the State's expert to testify about the Psychopathy Checklist-Revised (PCL-R) and Gomez's psychopathic traits because that testimony did not lead to a mental health diagnosis. We affirm.

## I. BACKGROUND

### A. Prior Convictions

On May 30, 2008, in Cause No. 04-CR-511-D, a Cameron County District Court revoked Gomez's probation and convicted Gomez of five counts of aggravated sexual assault of a child, *see* TEX. PENAL CODE ANN. § 22.021 (West, Westlaw through 2017 1st C.S.), and one count of indecency with a child (by contact), *see id.* § 21.11(a)(1) (West, Westlaw through 2017 1st C.S.), and sentenced him to a ten-year term of imprisonment. That same day, the same court, in cause No. 07-CR-1945-D, convicted Gomez of two counts of aggravated sexual assault of a child and sentenced him to a ten-year term of imprisonment. *See id.* § 22.021.

### B. Civil Commitment Proceeding

On January 14, 2016, the State filed its original petition for civil commitment. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153 (West, Westlaw through 2017 1st C.S.). It alleged that Gomez is an SVP and requested that he be committed for treatment and supervision. *See id.* § 841.003(a).

#### 1. SVP Law

Under Texas law, a person can be found to be a "sexually violent predator" if the person: "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral

abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* A "[b]ehavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

### 2. Gomez's Testimony

Gomez's commitment proceeding was tried to a jury. Gomez testified regarding his prior convictions. He explained that the first six offenses involved his girlfriend's twelve-year-old sister and occurred when he was living with his girlfriend's family. Gomez agreed that, in his opinion, this sexual contact was consensual. He further testified that it only happened once, yet acknowledged that, in his voluntary written statement to police, he had said that it happened on other occasions. The trial court admitted this statement into evidence. Gomez further acknowledged that he was convicted of five counts of aggravated sexual assault against this child, offenses that happened on different dates. The trial court placed Gomez on probation for this conviction but, as Garcia testified, the court revoked his probation, in part, because he was alone with his minor daughters, then ages one and two, on several occasions during his probation. The sexual acts that occurred when he was with his daughters resulted in his subsequent conviction for sexually assaulting minor children. Although Gomez denied the acts, he agreed that he told police they occurred, as reflected in his statement that the court admitted as a trial exhibit. Gomez stated that he had lied to the police because he was under the influence of drugs and alcohol and he was sleep deprived— everything was "like a blur" and he would just "say 'yes' or 'no' to questions so they could

3

stop asking [him] questions." Gomez also acknowledged his conviction for these offenses.[1]

### 3. The Experts' Testimony

The State called expert forensic psychologist Stephen Thorne, Ph.D., as a witness. Gomez presented forensic psychologist and neuropsychologist Antoinette McGarrahan, Ph.D., to testify in his defense. Both witnesses examined Gomez prior to testifying.

### a. General Definitions and Methodologies

Each expert provided the jury with the statutory definition of "behavioral abnormality" found in chapter 841 of the Texas Health and Safety Code. *See id.* Each expert presented similar understandings of the definition's various components. They agreed that the methodology employed when conducting behavioral abnormality evaluations includes reviewing records, conducting a personal interview, performing psychological and/or actuarial testing, and applying the relevant research to the specific case. The experts testified that the use of this methodology is the accepted standard in the field of forensic psychology.

### b. PCL-R—a Psychopathic Checklist

Each expert utilized the PCL-R to determine whether Gomez met the criteria as a psychopath, as required by statute. *See id.* § 841.023(a). Dr. Thorne defined a "psychopath" as "somebody who's thought to be kind of an aggressive, violent narcosis,

---

[1] The trial court in this civil-commitment case took judicial notice that aggravated sexual assault of a child under section 22.021 of the penal code, and indecency with a child (by contact) under section 21.11(a)(1) of the penal code are sexually violent offenses for the purposes of chapter 841 of the health and safety code. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.002(8)(A) (West, Westlaw through 2017 1st C.S.); TEX. PENAL CODE ANN. §§ 21.11(a)(1), 22.021 (West, Westlaw through 2017 1st C.S.).

that they are very self-centered, that they use people to their advantage, that they don't have empathy or remorse towards other individuals, and that they're more likely to engage in wide-ranging antisocial and criminal acts."

Dr. Thorne scored Gomez as a 23 on this test of twenty items, each rated at a zero, one, or two. He explained that a score of 23 out of a possible 40 placed Gomez "in the moderate range of psychopathic traits," but not with a diagnosis of psychopath.[2] Dr. Thorne testified that Gomez exhibited the following traits: lack of remorse, elevated self-esteem, impulsiveness, an extensive history of lying, lack of responsibility, and inability to follow the terms of his mandatory supervision.

According to Dr. McGarrahan, Gomez received her PCL-R score of 12, indicating that he has a low level of psychopathic characteristics. She explained that she found the following traits definitely present: lack of remorse or guilt, promiscuous sexual behavior, and behavior that resulted in the revocation of his probation. Dr. McGarrahan agreed that, like "[m]ost people," Gomez had psychopathic characteristics. She agreed with Dr. Thorne that Gomez does not meet the criteria under the PCL-R to be diagnosed as a psychopath.

### c.    Static-99R—Evaluation of Static Risk Factors

The experts testified that each used the Static-99R. They explained that the Static-99R is an actuarial instrument that assesses someone's likelihood of engaging in a certain act in the future. Dr. McGarrahan stated that the Static-99R tests for "ten [static or unchanging] risk factors that go into sexual violence, engaging in sexual violence in

---

[2] Dr. Thorne explained that he uses 30 or above on the PCL-R as indicative of a psychopath, while others use 25.

the future."[3]    According to Dr. Thorne, he used the Static-99R and its relevant, researched risk factors to assess Gomez's likelihood of committing a sexual offense in the future.

Both experts scored Gomez a 5, which, according to Dr. Thorne, places him in the moderate-to-high risk range, and, according to Dr. McGarrahan, places him "in the moderate range of the higher end of moderate for engaging in a sexually violent offense in the future."[4]    While Dr. McGarrahan believed the Static-99R accurately reflected Gomez's risk of reoffending, in her opinion, his score did not change whether or not Gomez suffers from a behavioral abnormality.[5]    Each testifying expert reviewed his or her scoring sheet with the jury, explaining the scores and the reasons for them.[6]

### d.    Other Risk Factors

Both Drs. McGarrahan and Thorne agreed that Gomez has a history of sexual deviance, which, according to Dr. Thorne, is one of the biggest risk factors that increases somebody's risk of future sexual offending.    But Dr. McGarrahan testified that she did

---

[3] Dr. McGarrahan identified and explained the relevance of the static risk factors that she evaluated on this test, including among others:   age, living arrangements, non-sexual violence convictions, prior sex offenses, and acts involving strangers.

[4] Dr. Thorne testified that the records contained an earlier Static-99R assessment by another professional.   Gomez also received a positive 5 score from that evaluation.

[5] According to Dr.  McGarrahan, "someone with a score of 5 is 2.7 times [more] likely to engage in sexual recidivism" than "your average, or routine, sex offender who scores a 2."   Dr. McGarrahan also employed the forensic version of the Sexual Risk Assessment, which she described as an instrument that looks at non-static risk factors.   She scored Gomez a 2.16, which, according the Dr. McGarrahan, means that he is at "a moderate level of need."

[6] Dr. Thorne explained that while the results of the PCL-R and the Static-99R do not say whether a person suffers from a behavioral abnormality, "[t]hey're pieces to the puzzle."

6

not believe that Gomez "would engage in predatory acts of sexual violence" in the future because "the sexual offenses he has, in [her] opinion, are not predatory in nature."[7]

In his assessment of other risks of sexual reoffending, Dr. Thorne testified that he diagnosed Gomez with pedophilic disorder.[8]  Dr. McGarrahan testified that she did not arrive at such a diagnosis.  And even if she had diagnosed Gomez with pedophilia, Dr. McGarrahan agreed that Gomez would still not be likely to engage in a predatory act of sexual violence because a person can suffer from pedophilic disorder and not suffer from a behavioral abnormality.

Dr. Thorne also acknowledged that Gomez had previously been diagnosed with major depressive disorder.  According to Dr. Thorne, Gomez had a history of depression, and a person can become so depressed that it affects their judgment.  He explained that, according to the records, Gomez previously tried to kill himself, which demonstrates an impulsivity that Dr. Thorne considered relevant.

Dr. Thorne also determined that Gomez "probably meets the criteria for multiple drug-related diagnoses."  Yet, while listing Gomez's past substance abuse as a risk factor for Gomez and agreeing that he would need substance abuse treatment, Dr. McGarrahan noted that, in her opinion, this risk factor did not predispose Gomez to commit a predatory act of sexual violence, only sexual violence.

---

[7] Dr. McGarrahan explained that Gomez's offenses are not included in the definition of "predatory act" because "those incest offenses[, such as the acts committed against his daughters and his girlfriend's sister,] are not typically viewed in the psychology field as being predatory."

[8] According to Dr. Thorne, a pedophilic disorder requires a period of at least six months during which an adult displays sexual interests, behaviors, or thoughts about pre-pubescent children as those thirteen years of age or younger.  He explained that a pedophilic disorder is a congenital or acquired condition that would affect Gomez's emotional or volitional capacity.

Finally, Dr. Thorne explained that although he did not diagnose Gomez with antisocial personality disorder, he did assign Gomez a V-Code condition—not a DMS-V diagnosis—of adult antisocial behavior. Dr. Thorne described antisocial behaviors as "[i]llegal behaviors, behaviors that violate the safety or the well-being, the health of other individuals that are kind of against the traditional [legal and social] norms."[9] According to Dr. Thorne, antisocial behavior is another of the biggest risk factors for sexually reoffending. Dr. Thorne testified that Gomez exhibited traits of antisocial behavior, including being convicted for sex offenses, being convicted for stealing beer from a convenience store, being detained at the border for purchasing animal tranquilizers, using a variety of illegal drugs, and having multiple disciplinary cases in prison. Dr. McGarrahan testified that she also saw some antisocial traits in Gomez, including being irresponsible in the past, not being completely honest in the past, and having trouble with the law.[10] According to Dr. McGarrahan, she did not, however, feel that Gomez "met the full criteria for antisocial personality disorder" because such traits must be exhibited prior to age fifteen and she did not see any indication of such conduct disorder prior to age fifteen for Gomez.

Other risk factors Dr. Thorne found for Gomez included having a non-familial victim and reoffending sexually while on probation for a sexually violent offense.[11] Dr.

---

[9] Dr. Thorne agreed that some of the psychopathic traits are similar to those found in someone with antisocial behavior traits.

[10] Dr. McGarrahan identified other typical antisocial behaviors, including "talking about harming other people, engaging in fire setting, cruelty to animals, things that then go on to be indicative of hurting humans down the road." She did not testify that Gomez exhibited these behaviors.

[11] According to Dr. Thorne, while research suggests that successfully completing sex offender treatment lowers a person's risk to reoffend sexually, persistence after punishment is a risk factor with "significantly higher levels of sexual recidivism." Gomez was court-ordered into sex offender treatment as

McGarrahan also found, as a risk factor, that Gomez was offending after punishment and while on probation.

### e. Protective or Mitigating Factors

In addition, the experts testified about protective or mitigating factors that lower a person's risk for sexual reoffending. Dr. McGarrahan testified that Gomez does not have any protective factors that would reduce his risk of reoffending, while Dr. Thorne summarized the following protective factors he found for Gomez: he is not a psychopath, he has no stranger victims, and he has no male victims. Good social support is theoretically a protective factor, but Dr. Thorne did not believe this was so for Gomez because he enjoyed a good support system at the times he committed his sexual offenses. Finally, it is undisputed that Gomez was, at the time of trial, in the early stages of a nine-month sex-offender-treatment program through the Texas Department of Criminal Justice. Dr. Thorne testified that Gomez had talked about all of his offenses in treatment, but had not admitted to all of them, so Gomez's treatment was not yet a protective factor.

### f. The Experts' Opinions

Both experts evaluated Gomez and offered opinions as to whether Gomez suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See id.* For the State, Dr. Thorne opined that Gomez does suffer from such a behavioral abnormality. *See id.* For the defense, Dr. McGarrahan testified that

---

part of his original probation, and he testified that he learned relapse prevention and reported that he successfully completed an eighteen-month program. Yet, as Dr. Thorne noted, Gomez reoffended after treatment. Dr. Thorne identified reoffending against new sexual victims while on probation is another big risk factor.

9

Gomez does not. *See id.* Importantly, neither expert assigned a specific mental health diagnosis to Gomez in arriving at their respective opinions.

### 4. Final Judgment and Order of Commitment

On August 17, 2016, after the parties rested, the trial court directed a partial verdict that Gomez is a repeat sexually violent offender, the first element required for commitment under the SVP statute.[12] *See id.* § 841.003(a). The jury returned a unanimous verdict finding that Gomez is a sexually violent predator, thereby, implicitly finding the remaining required element—that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See id.* § 841.002(2). The trial court entered a final judgment reflecting the jury's verdict and ordered that Gomez be civilly committed. After the trial court denied his motion for new trial, Gomez filed this appeal.

## II. LEGAL SUFFICIENCY OF THE EVIDENCE[13]

By his first issue, Gomez challenges the legal sufficiency of the evidence to support the jury's conclusion that he is an SVP—that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. He contends the

---

[12] Gomez does not challenge this ruling on appeal.

[13] Gomez also challenges the factual sufficiency of the evidence in his second issue. But to preserve this issue for appeal, a complaint challenging the factual sufficiency of the evidence to support a jury finding in a civil case, must be urged in a motion for new trial, *see* TEX. R. CIV. P. 324(b), and ruled on by the trial court. *See* TEX. R. APP. P. 33.1(a); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex. 1991) ("A point in a motion for new trial is a prerequisite to complain on appeal that the evidence is factually insufficient to support a jury finding . . . ."); *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146, 149 (Tex. App.—Corpus Christi 1996, no writ) (same); *see also In re Commitment of Day*, 342 S.W.3d 193, 206–17, (Tex. App.—Beaumont 2011, pet. denied) (reviewing a civil commitment case for factual sufficiency where a motion for new trial concerning factual sufficiency). Because Gomez did not raise factual sufficiency in his motion for new trial, he did not preserve this factual-sufficiency issue for appellate review. We overrule Gomez's second issue.

evidence is legally insufficient because, to establish a "behavioral abnormality," the State must show that Gomez was diagnosed with a mental health condition recognized by the DSM-V, and there was no such diagnosis here. In the alternative, Gomez asserts that even if we conclude that such a DSM-V recognized diagnosis is not necessary, the evidence is legally insufficient because "[t]here is simply too great an analytical gap between" the State expert's diagnosis of a V-Code condition—adult antisocial disorder— and the ultimate conclusion that Gomez suffers from a behavioral abnormality. *See Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 727 (Tex. 1998) (providing that a court may reject an expert's testimony when "there is simply too great an analytical gap between the data and the opinion proffered").

The State responds that its expert's use of a V-Code condition to note that Gomez has antisocial personality traits does not render his opinion legally insufficient. The State reasons that the evidence is sufficient because the SVP statute does not require a mental health diagnosis as a prerequisite to commitment, case law supports civil commitment without a mental health diagnosis, and the standard methodology used by evaluators does not include making diagnoses. The State asserts that when all of the evidence is viewed in a light most favorable to the verdict, the evidence is legally sufficient to support the verdict, and there is no analytical gap.

## A.      Standard of Review

In SVP cases, the State must prove the elements of its case beyond a reasonable doubt. *See id.* § 841.062(a). Because the statute places upon the State the burden of proof employed in criminal law, we adopt the appellate standard of review in criminal cases for legal sufficiency of the evidence, as did the Beaumont Court of Appeals in *In re*

11

*Commitment of Mullens.* *See* 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In a legal sufficiency review, this Court reviews all of the evidence in a light most favorable to the verdict to determine whether any rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP statute. *Id.*; *see In re Commitment of Anderson*, 392 S.W.3d 878, 881 (Tex. App.—Beaumont 2013, pet. denied); *see also* TEX. HEALTH & SAFETY CODE ANN. § 841.003(a).

## B.    Discussion

### 1.    No Mental Health Diagnosis Is Required in a Behavioral Abnormality Evaluation

Neither expert included making a mental health diagnosis as part of the standard methodology employed in behavioral abnormality evaluations. Both experts testified, and we agree that there is no statutory requirement of a mental health diagnosis to civilly commit a person as an SVP; chapter 841 reveals no requirement of a diagnosis. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153.

Rather, section 841.023(a) of the SVP statute provides the only statutory directive to an examining expert: "[t]he expert shall make a clinical assessment based on testing for psychopathy, a clinical interview, and other appropriate assessment and techniques to aid the department in its assessment." *Id.* § 841.023(a).

The Texas Legislature enacted the SVP statute in 1999 after the United States Supreme Court decided *Kansas v. Hendricks.* *See* 521 U.S. 346, 356–59 (1997) (considering the Kansas equivalent to the Texas SVP statute and dismissing the argument that a finding of a mental illness was a prerequisite to commitment). The

12

*Hendricks* Court ultimately determined that legal definitions "need not mirror those advanced by the medical profession" and concluded that Hendricks's pedophilia diagnosis qualified as his mental abnormality.  *Id.*

The legislature made major revisions to the SVP statute in 2015,[14] after the Texas Supreme Court decision in *In re Commitment of Bohannan*.[15]  388 S.W.3d 296, 306 (Tex. 2012) ("A medical diagnosis of a person's mental health may certainly inform an assessment of whether he has an SVP's behavioral abnormality, but the principal issue in a commitment proceeding is not a person's mental health, but whether he is predisposed to sexually violent conduct."); *see also In re Commitment of Pickens*, No. 09-14-00391-CV, 2016 WL 821426, at *2 (Tex. App.—Beaumont Mar. 3, 2016, pet. denied) (mem. op.) ("A diagnosis of a mental disorder is not a prerequisite for civil commitment.") (citing *In re Commitment of Richard*, No. 09-13-00539-CV, 2014 WL 2931852, at *2 (Tex. App.—Beaumont June 26, 2014, pet. denied) (mem. op.), *cert. denied*, 135 S.Ct. 1747 (2015) (holding that the expert "was not required to make any mental diagnosis")).[16]  But the 2015 revisions made no changes to the definitions of "behavioral abnormality" or

---

[14] Effective June 17, 2015, Senate Bill 746 amended Chapter 841 of the Texas Health and Safety Code in several respects.  *See* Act of May 21, 2015 84th Leg., R.S., ch. 845, 2015 Tex. Sess. Law Serv. 2701, 2701–12.

[15] At issue in *In re Commitment of Bohannan* was the exclusion of expert testimony because the expert was neither a psychologist nor a psychiatrist.  388 S.W.3d 296, 302 (Tex. 2012).  The *Bohannan* Court considered what had to be proven in a civil commitment proceeding and who could prove it.  *See id.* at 302–06.

[16] Because the Beaumont Court's decisions are not binding on this Court, Gomez asks us to consider on our own whether a mental health diagnosis is required.  We do consider on our own whether such a mental health diagnosis is required; however, the Beaumont Court opinions are well reasoned and provide guidance for this Court.  *See Thomas v. Cook*, 350 S.W.3d 382, 395 n.2 (Tex. App.—Houston [14th Dist.] 2011, pet denied); *see also Garza v. Deleon*, No. 13-13-00342-CV, 2013 WL 6730177, at *5 (Tex. App.—Corpus Christi Dec. 19, 2013, no pet.) (mem. op.).

"SVP."  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.002(2), (9); 841.003(a).  The revisions did not add a requirement of a formal diagnosis.  When the legislature meets after a particular statute has been judicially construed, as in this case, and does not change the statute, the courts presume that the legislature agreed with the construction. *See Miller v. State*, 33 S.W.3d 257, 260 (Tex. Crim. App. 2000) (on reh'g en banc) ("When a statute is reenacted without material change, it is generally presumed that the legislature knew and adopted or approved the interpretation placed on the original act, and intended that the new enactment should receive the same construction as the old one."); *see also Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) ("It is a firmly established statutory construction rule that once appellate courts construe a statute and the Legislature re-enacts or codifies that statute without substantial change, we presume that the Legislature has adopted the judicial interpretation.").

Our review of the SVP statute reveals no requirement of a mental health diagnosis. The courts have interpreted the SVP statute to require no formal diagnosis, with no legislative changes after such interpretation.  The experts in this case acknowledged that a diagnosis is not included in the methodology.  Likewise, we conclude that the absence of a formal diagnosis is not fatal to this sufficiency review.

**2. Dr. Thorne's Opinion Was the Result of Reasoned Judgment; There Was No Analytical Gap**

Alternatively, Gomez asserts that, should we decide that a diagnosis is not required, at least in this case, there should be an exception to not requiring a diagnosis. *See Bohannan*, 388 S.W. at 303.  Gomez argues that, here, there is no question that the DSM-V does not recognize someone as having a diagnosis of adult antisocial behavior.

14

But because the State's expert used a V-Code condition to help prove "behavioral abnormality," he should be required to do so through an actual DSM-V recognized diagnosis.[17]   Gomez asserts that there is simply too great an analytical gap between the identification or diagnosis of a V-Code condition and the conclusion that Gomez's suffers from a behavioral abnormality.   *See Gammill*, 972 S.W.2d at 727 (discussing whether "there is simply too great an analytical gap between the data and the [expert's] opinion offered").   Without an actual DSM-V recognized diagnosis, Gomez asserts that the evidence is legally insufficient to support a jury's conclusion that Gomez suffers from a behavioral abnormality.   In this case, we disagree.

Gomez's arguments have been rejected in other courts.   The Beaumont Court of Appeals found that an expert used "reasoned judgment based upon established research and techniques for his profession" when the expert reviewed historical records of the person's behaviors, personally interviewed the person, and employed the actuarial tools that are recognized and utilized in his profession to determine conditions and evaluate levels of risk.   *See In re Commitment of Day*, 342 S.W.3d 193, 204 (Tex. App.—Beaumont 2011, pet. denied).   In other SVP cases, the courts have determined that the expert used reasoned judgment based upon established research and techniques for his profession when the expert reviewed the records and interviewed the person, was licensed in the expert's field, conducted the evaluation in accordance with the accepted standards of the expert's field, and explained how he used the records to reach his opinions.   *See In re Commitment of Dodson*, 434 S.W.3d 742, 750 (Tex. App.—

---

[17] Gomez does not identify the DSM-V recognized diagnoses that he claims the State's expert should have used.

15

Beaumont 2014, pet. denied); *see also In re Commitment of Kalati*, 370 S.W.3d 435, 438–39 (Tex. App.—Beaumont 2012, pet. denied).

In this case, the State's expert was licensed in his field and followed the standard accepted practices in conducting his evaluation of Gomez. Dr. Thorne testified that he reviewed the types of records standard for these evaluations and explained how he used the records to arrive at his opinion.[18] He used instruments accepted by his profession for these types of evaluations. According to Dr. Thorne, he assessed risk and named risk factors for Gomez, finding that the following were Gomez's greatest risk factors:

> [H]e has a documented history of sexual deviancy with three separate child victims, and . . . after pleading guilty to the initial sexual offenses and receiving a probation sentence, he reoffended against two new sexual victims while on probation. And even outside of those offenses, there is some evidence in the records of additional sexually deviant behavior and additional antisocial behavior.

Dr. Thorne agreed that, in his expert opinion, Gomez suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

We cannot conclude that there was too great an analytical gap between his methodology, his reasoning, and the opinion he offered. *See Gammill*, 972 S.W.2d at 727; *see also* TEX. R. EVID. 702. Instead, we conclude that Dr. Thorne's opinion was reasoned and based upon established research and techniques for his profession. *See Day*, 342 S.W.3d at 204; *Dodson*, 434 S.W.3d at 750; *Kalati*, 370 S.W.3d at 438–39.

---

[18] We note that Dr. Thorne originally said he "diagnosed [Gomez] with something called adult antisocial behavior, which is something we call a 'V-Code.'" Thorne later clarified that a "V-Code" is not the same as a diagnosis, "it's listed as a condition in the DSM."

We cannot conclude that Dr. Thorne's testimony misled the jury. It was free to discount Dr. Thorne's opinion if they felt that his methodology and the bases for his opinion, including the V-Code condition of adult antisocial behavior, were not sufficient to support the expert's opinion. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony."). This Court cannot impose its opinions to the contrary. *Id.*

16

Moreover, our review of the evidence set out above supports the jury's verdict. It was entitled to draw reasonable inferences from basic facts to determine ultimate fact issues. *See Anderson*, 392 S.W.3d at 882. The jury was entitled to resolve conflicts and contradictions in the evidence by believing all, part, or none of a witness's testimony. *See id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Considering all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Gomez suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See Mullens*, 92 S.W.3d at 885. So the evidence is legally sufficient to support Gomez's civil commitment as an SVP.

## C. Summary

We have rejected each of Gomez's arguments in support of his first issue, and we have instead concluded that: no diagnosis was required; there was no analytical gap between Dr. Thorne's methodology, his reasoned judgment, and his proffered opinion such that an exception, if any, to the no-diagnosis requirement applied; and the evidence was legally sufficient to support Gomez's civil commitment. We overrule Gomez's first issue.

## III. ADMISSION OF TESTIMONY REGARDING THE PSYCHOPATHY CHECKLIST (PCL-R) AND GOMEZ'S PSYCHOPATHIC TRAITS

By his third issue, Gomez contends the trial court abused its discretion when it admitted Dr. Thorne's testimony about the PCL-R because it did not lead to a diagnosis. He also complains that the trial court abused its discretion when it admitted Dr. Thorne's testimony about Gomez's psychopathic traits because it did not lead to a diagnosis and

because it was irrelevant in determining whether Gomez suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* TEX. R. EVID. 401 (providing that evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action). The State responds that to the extent Gomez preserved the issue, the trial court did not abuse its discretion because it was guided by the rules of evidence and the SVP statute when it allowed the State's expert to testify about testing Gomez for psychopathy and the traits he believed Gomez exhibited. We agree with the State.

## A. Standard of Review

We review evidentiary rulings for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

## B. Discussion

Dr. Thorne testified that the second edition of the PCL-R is an instrument typically scored by forensic psychologists performing behavioral abnormality evaluations. He explained that the test does not determine whether a person has a behavioral abnormality. But, Dr. Thorne further explained that the SVP statute requires the person be tested for psychopathy and that the PCL-R is "an instrument that's commonly used in forensic cases to determine whether or not somebody meets the criteria as a psychopath." *See* TEX. HEALTH & SAFETY CODE ANN. § 841.023(a). At trial, over

18

Gomez's objection, the State moved to display the PCL-R checklist. After being informed that the PCL-R results were a part of Dr. Thorne's report, the trial court admitted it.

In sum, Dr. Thorne testified that, with a range of 0 to 40, Gomez's score of 23 on the PCL-R "places him in the moderate range of psychopathic traits." Dr. Thorne testified that he did not believe that Gomez is a true psychopath but that Gomez does have some psychopathic traits. Additionally, Gomez's expert, Dr. McGarrahan, testified that she utilized the same instrument, scored Gomez as a 12, and identified certain psychopathic traits she saw in Gomez. Dr. McGarrahan also referred to the PCL-R as "the gold standard in our field for looking at whether somebody's a psychopath."

We find nothing objectionable in this testimony. Instead, the rules of evidence allow it, and the SVP statute requires it. Drs. Thorne and McGarrahan testified about their use of the PCL-R and the results of Gomez's PCL-R testing for psychopathy. The SVP statute requires that the expert's evaluation include testing for psychopathy: "[t]he expert shall make a clinical assessment based on testing for psychopathy, a clinical interview, and other appropriate assessment and techniques to aid the department in its assessment." *Id.* And the rules of evidence provide for the disclosure at trial of the bases of an expert's opinion. TEX. R. EVID. 705 (providing for the disclosure of the underlying facts or data and the examination of an expert about them). Because the trial court followed the rules of evidence and the SVP statute's requirements, we cannot conclude that the PCL-R testing was not relevant as Gomez asserts or that the trial court abused its discretion in admitting testimony concerning the PCL-R and Gomez's

19

psychopathic traits.[19]   *See id.* R. 401, 705; TEX. HEALTH & SAFETY CODE ANN. 841.023(a);

*Bay Area Healthcare*, 239 S.W.3d at 234; *Owens–Corning Fiberglas Corp.*, 972 S.W.2d

at 43; *Alvarado*, 897 S.W.2d at 753.   We overrule Gomez's third issue.

## IV.   CONCLUSION

We affirm the trial court's judgment of civil commitment.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 14th
day of December, 2017.

---

[19] We assume without deciding that Gomez preserved his relevancy argument for appeal.