

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRADFORD VERNON BLAKEWAY | § | No. 08-23-00279-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | |
| | § | 394th Judicial District Court |
| THE STATE OF TEXAS, | § | of Jeff Davis County, Texas |
| Appellee. | § | (TC# CR2300920) |
| | § | |

## MEMORANDUM OPINION

Appellant Bradford Vernon Blakeway was indicted by a grand jury on four separate offenses stemming from an event that occurred on February 20, 2023, in which Appellant allegedly threatened, assaulted, and kidnapped Jeff Fisher in retaliation for Fisher testifying against him in a prior court proceeding. A jury found Appellant guilty of one count of first-degree aggravated assault by threat and one count of aggravated assault by causing bodily injury, both with the use of a deadly weapon and both in retaliation against Fisher for his service as a witness; one count of aggravated kidnapping with the use of a deadly weapon; and one count of retaliation for threatening Fisher due to his prior service as a witness. In this appeal, which is from the conviction

1

for aggravated kidnapping,[1] Appellant contends the State failed to produce legally sufficient evidence to support the requisite finding that he "interfered substantially" with Fisher's liberty. For the reasons set forth below, we disagree and affirm his conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Events prior to the offense

The victim, Jeff Fisher, testified at trial as follows. He and Appellant had been friends and neighbors since 2007, living in a rural area approximately 20 minutes from Fort Davis, Texas called the Davis Mountain Resort (the DMR). Fisher and his wife assisted Appellant when he suffered two strokes—one in 2018, and a second in late 2019 or early 2020. Fisher often bought groceries and ran errands for Appellant, as Appellant had difficulty driving due to his vision issues.

After his second stroke, law enforcement forced Appellant to go to the hospital in an ambulance. Thereafter, Appellant, who was never a "fan" of law enforcement, and believing they had no right to enter the DMR, told Fisher he was "frustrated" and "disgruntled" with law enforcement and believed they were "trying to kill him." In Fisher's presence, over the course of several days, Appellant began to "make threats to the legal community and the . . . people in the courthouse," and began voicing an intent to go to the courthouse and "shoot lawmen." On one occasion, Appellant told Fisher that he was "liable to wake up one morning . . . and go down to the courthouse, kill civilians, and then kill all men and keep killing." Fisher believed he was the only person to whom Appellant voiced his threats.

---

[1] The grand jury issued separate indictments for each of the four offenses, but the trial court consolidated them for purposes of trial. Appellant filed separate notices of appeal for each conviction. We address the other three appeals in separate opinions that we issue this day in Cause Numbers 08-23-00277-CR, 08-23-00278-CR, and 08-23-00280-CR.

Taking the threats seriously, Fisher reported them to the authorities. Appellant was later charged with making a terroristic threat. He was in jail for approximately 18 months awaiting trial.[2] In December 2021, at Appellant's jury trial, Fisher was the State's main witness. There, Fisher testified that he heard Appellant threaten to "shoot people at the courthouse" and "go down to the courthouse and kill lawmen." The trial resulted in a hung jury. The State thereafter filed a motion to dismiss the charge, as it had not discovered additional evidence that would "change the outcome of a second trial." The trial court granted the motion on February 22, 2022.

Several months later, on November 30, 2022, Appellant appeared at the office of William Ghormley, II, the elected treasurer for the DMR corporation, who recalled Appellant asking his office to inform all residents that no law enforcement officer was allowed in the DMR. When Ghormley informed him that he would need a court order to prevent anyone from entering the DMR, Appellant responded that he did not need one from "those evil people." Ghormley recalled Appellant specifically referring to the county sheriff and his deputies, a specific Texas Department of Public Safety officer, and Judge Ferguson[3], contending "they were lying evil people and that he didn't need their help or their permission." Ghormley also recalled Appellant saying that Fisher was "an evil, lying, deceitful, man and that he was going to get him," which Ghormley interpreted to mean Appellant intended to do "bodily harm" to Fisher. Ghormley reported the matter to the sheriff's office and, that same afternoon, provided a written statement, which was introduced in evidence at the current trial.

---

[2] The record reflects that prior to his 2021 trial, an expert found Appellant incompetent to stand trial, but the jury disagreed and found him competent.

[3] Judge Ferguson is the presiding judge of the 394th Judicial District Court in Jeff Davis County in which Appellant's trial for terroristic threat was held.

### B. The events of February 20, 2023

#### (1) The assault on Fisher

According to Fisher, he had no contact with Appellant between the time the trial court dismissed the terroristic threat charge and February 20, 2023, when he encountered him in the DMR "campground" area. Fisher, who does "well service[s]" in the area, explained that he leased a space at the campground where he kept storage containers for his business equipment and tools. He recalled that he was moving some equipment from his truck into the storage containers at approximately 9:30 a.m. that day, when he observed Appellant's parked vehicle approximately 200 feet away by the "washateria."

Appellant began walking toward Fisher at a "brisk pace," and as he got closer, Fisher saw that Appellant was holding a gun. Appellant told Fisher, who was standing on his truck at the time, to get down from the "goddamn truck, you motherfucker, or I'm going to blow your fucking head off." After Fisher complied, Appellant pointed the gun at him and told him to raise his hands, saying he had a "warrant for [his] arrest" and was "making a citizen's arrest." Fisher testified that Appellant then ordered him, at gunpoint, to put his hands up and walk over to the storage containers approximately 12 to 15 feet away, while continuing to threaten him. Appellant told Fisher to put his hands on the containers then "frisked" him for weapons. Appellant directed Fisher to clasp his hands on his head and walk over to Appellant's truck. As he walked, Appellant continued to threaten to "blow [Fisher's] fucking head off" if he tried to turn or move away from him.

Upon reaching Appellant's truck, Appellant directed Fisher to walk to the passenger side and put his hands on the hood. Fisher recalled Appellant standing behind him saying Fisher had "ruined [his] life," stolen gasoline from the reserve tanks on Appellant's property, and stolen

4

money from him—apparently referring to occasions on which Appellant had given him money to buy groceries and supplies for him, all of which Fisher denied.[4] Appellant repeated that he had a "warrant for [Fisher's] arrest" but that he would release Fisher if he would "go tell the Judge that [he] lied about [Appellant] wanting to go down to the courthouse and burn it down." Fisher responded that he did not say that to the judge. When Appellant asked him what he did say, Fisher replied that he "told them" he had heard Appellant say he was "going to go into the courthouse and shoot lawmen" and "kill lawmen." Fisher recalled the conversation ending at that point. When asked if he believed Appellant was "angry" with him for reporting the threats, Fisher testified that Appellant did not express that he was, but Fisher acknowledged that Appellant may have been angry with him over being in jail while awaiting trial on the terroristic threat charge resulting from Fisher's report.

Fisher recalled that after their conversation ended, Appellant began backing away while keeping the gun pointed at him and telling him to "stay still" or he would "blow [his] fucking head off." Appellant then took an ax handle from his truck and came toward Fisher. Holding both the gun and the axe handle, he told Fisher he was going to "teach" him something. Fearing Appellant was going to harm him, Fisher "broke and went into him." A struggle ensued, during which Appellant hit Fisher on his left arm with the axe handle. As Appellant was hitting him, Fisher grabbed the axe handle and hit Appellant over the head with it four or five times in an attempt to incapacitate Appellant and "defend [his] life." Fisher continued to hit Appellant on his head, shoulder, and back with the axe handle until the gun flew out of Appellant's hand. He then hit

---

[4] According to Fisher, Appellant had never accused him of stealing prior to this event. Fisher testified that he had receipts for all the purchases he made for Appellant.

Appellant one final time to prevent him from retrieving the gun. After unsuccessfully trying to calm Appellant down, Fisher fired three shots in the air as a call for help, after which Appellant told him "I'm done."

### (2) Events following the assault

Fisher tried to "herd" Appellant to an area where his cell phone had service so he could call 911, but Appellant continued to threaten him. Fisher then "bolted" and drove off in his truck to Joy Bates's house. Bates, Fisher's neighbor, testified at trial that when Fisher arrived, he had a gun and an axe handle, and appeared "scared" and was "shaking." Fisher told her Appellant had assaulted him. Bates recalled that although Fisher did not appear injured, he had blood on his clothes, which Fisher told her came from Appellant's head after Fisher hit him with the axe handle. According to Bates, Fisher attempted to call 911 from her house but was unable to due to poor cell phone service. Fisher then walked across the street where she believed he was able to call 911.

Fisher confirmed that he was able to call 911 from another neighbor's house to report that he had been assaulted by Appellant. The 911 operator testified that Fisher, sounding "frantic," reported that Appellant had assaulted him but that he had been able to take Appellant's gun and hit Appellant with it.

Chief Deputy Jeff Walker of the Jeff Davis County Sheriff's Office and Officer Victor Lopez of the Marfa Police Department were dispatched to the scene of the incident. The officers testified that when they arrived, Fisher pulled up in his vehicle at a high rate of speed and jumped out with a gun and an axe handle in his hands, appearing to be scared and upset. Fisher informed the officers that Appellant had approached him earlier that morning, threatened him at gunpoint, and taken an axe handle from his vehicle. Fisher described the struggle that ensued, during which

6

he was able to take the gun and axe handle from Appellant, acknowledging that he hit Appellant's head with the axe handle in response to Appellant's threats.

The officers did not recall seeing any blood on Fisher, but they both observed blood on the axe handle, which Fisher acknowledged came from Appellant's head when he hit Appellant. The officers recalled that Fisher appeared uninjured, but for bruising on his left arm. Deputy Walker took two photographs of Fisher's left arm that day, which were admitted in evidence at trial. Fisher's wife also took photographs of the bruising on his arm two or three days later, which Fisher provided to the sheriff's office and were also admitted in evidence. Fisher acknowledged that he did not seek medical treatment for the injuries to his arm but averred that his arm "hurt."

Officer Lopez recalled that approximately 20 minutes after his interview with Fisher, he drove to the Jeff Davis Sheriff's Office, where he encountered Appellant and his neighbor, Daniel Gunn, who was taking Appellant to the hospital. Appellant informed Officer Lopez that Fisher had "hit him in the back of the head with a rock and had kicked him a couple times in the ribs and took his gun away from him." Observing that Appellant was "bleeding pretty bad" from his head and had blood all over him, he did not question Appellant at the time. He believed it was more important that Appellant be taken to the hospital. Still photographs were later obtained from Officer Lopez's body camera, which were introduced in evidence at trial, depicting Appellant sitting in the passenger seat of Gunn's car with his head covered in blood.

At trial, Gunn testified as a defense witness. He stated that he and Appellant generally did not have much contact with each other, even though they had been neighbors for ten or 12 years. However, he recalled that on February 20, 2023, Appellant came to his door covered in blood and appeared to have been beaten. Appellant informed him that Fisher had hit the back of his head with

a rock and beat him with an axe handle after taking his gun. Appellant told Gunn that he wanted to call the Texas Department of Public Safety (DPS), rather than the Sheriff's Office, but Gunn was unable to find a number for DPS.[5] At some point, Appellant asked Gunn to drive him to the hospital. On the way, Gunn stopped in Fort Davis, where they encountered Officer Lopez and spoke with him about the incident before continuing to the hospital. Gunn believed that Appellant spent the night in the hospital although he was not asked to pick him up the next day.

Relevant to this appeal, a grand jury indicted Appellant in April 2023 on one count of aggravated kidnapping (a first-degree felony), alleging that on or about February 20, 2023, Appellant intentionally and knowingly abducted Jeff Fisher "by restricting [his] movements . . . without his consent so as to interfere substantially with his liberty, by moving [Fisher] from one place to another, with the intent to prevent his liberation, by using or threatening to use deadly force, namely shooting him with a firearm, and [Appellant] used or exhibited a deadly weapon, namely [a] firearm, during the commission of the offense." Appellant's jury trial was held in August 2023.[6]

### C. Appellant's defense and the jury's verdict

At trial, Appellant's attorney argued that Fisher's story was not credible, contending that it made no sense for Appellant, who was much older and weaker than Fisher, to attack him in

---

[5] The same 911 operator who received Fisher's call testified that she also received a call from Officer Lopez, who informed her that Appellant "wanted DPS." However, the operator informed Officer Lopez that DPS would not respond to an incident in a "residential area," and she therefore did not attempt to connect him to DPS.

[6] Judge Roy Ferguson presided over this trial. There is no indication on the record that either party sought to recuse him, and in fact, Appellant elected to have him assess punishment.

broad daylight.[7] He argued that Appellant was the true victim in the case, given his medical condition and Fisher's lack of any significant injuries. The State maintained that Fisher was credible, and his story was consistent. And, the State argued, the jury could find Appellant guilty of aggravated kidnapping based on his restraining Fisher and directing him to move while pointing his gun at him.

The jury was instructed that it could find Appellant guilty of aggravated kidnapping if it found that he intentionally or knowingly abducted Fisher "by restricting his movements without his consent so as to interfere substantially with his liberty, by moving him from one place to another, with the intent to prevent his liberation, and by using or threatening to use deadly force by shooting him with a firearm."

The jury found Appellant guilty of aggravated kidnapping, and the trial court sentenced him to 45 years in prison and imposed a $10,000 fine.[8] This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE AGGRAVATED KIDNAPPING CONVICTION

In his sole issue on appeal, Appellant contends there was legally insufficient evidence to support his conviction for aggravated kidnapping because the State failed to establish beyond a reasonable doubt that he interfered substantially with Fisher's liberty. We disagree.

---

[7] Prior to trial, two employees from the jail where Appellant was being held, including the nurse, contacted Appellant's attorney about their concerns regarding Appellant's competency. They reported he was suffering from increasing signs of dementia. Appellant's attorney filed a motion for a competency examination, but at a hearing on the motion the month before trial, defense counsel informed the trial court that he did not believe a competency evaluation was necessary, as he believed Appellant was able to communicate effectively with his office, understand the nature of the charges against him, and assist him with trial preparation. Upon agreement of the parties, and finding no basis for finding Appellant incompetent, the trial court denied the motion. However, at the punishment phase of the trial, defense counsel presented the testimony of the same two jail employees, who testified to their concerns.

[8] The trial court ordered this sentence to run concurrently with the sentences imposed for his other three convictions in this matter.

### A. Standard of review

Under the Due Process Clause of the United States Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing the sufficiency of the evidence to support a conviction, we apply the legal sufficiency standard as articulated by the U.S. Supreme Court in *Jackson v. State. See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *see also Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Under that standard, we view the evidence "in the light most favorable to the verdict" and recognize that because the jury is the "sole judge of the witnesses' credibility and the weight to be given their testimony," we must defer to the jury's credibility and weight determinations. *Brooks*, 323 S.W.3d at 899–900 (citing *Jackson*, 443 U.S. at 319). We therefore may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (holding that a reviewing court should not act as a "thirteenth juror" by overturning a jury's credibility and weight determinations).

In addition, it is firmly within the jury's province to resolve conflicts in testimony, and we must therefore presume the jury resolved any conflicting inferences in favor of the verdict. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319). "This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). A jury's verdict will therefore be upheld if any rational juror could have found the essential

elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).

### B. Applicable law

A person commits the offense of kidnapping "if he intentionally or knowingly abducts another person." Tex. Pen. Code Ann. § 20.03(a). A kidnapping rises to the level of "aggravated kidnapping" if the person "uses or exhibits a deadly weapon during the commission of the offense." Tex. Pen. Code Ann. § 20.04 (b). The term "'[a]bduct' means to restrain a person with intent to prevent his liberation by . . . using or threatening to use deadly force." Tex. Pen. Code Ann. § 20.01(2)(B). And in turn, the term "'[r]estrain' means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* at 20.01(1)(A). Applicable to the present case, such restraint is "without consent" if accomplished by "force, intimidation, or deception." *Id.* at 20.01(1)(A); *see also Hines v. State*, 75 S.W.3d 444, 446 (Tex. Crim. App. 2002) (discussing elements of aggravated kidnapping).

### C. Analysis

Appellant contends the State failed to prove beyond a reasonable doubt that he "interfered substantially" with Fisher's liberty. But he acknowledges that his argument depends on how we interpret "restraint." Appellant urges us to join courts from other states that have held that a restraint which is simply incidental to other crimes does not support a separate conviction for kidnapping or aggravated kidnapping, characterizing this view as the "modern approach." [9]

---

[9] Appellant primarily relies on the Connecticut Supreme Court's holding in which it recognized that a "considerable majority of state courts have followed the lead of New York and California in concluding that the crime of kidnapping does not include conduct involving a restraint that is merely incidental to the commission of some other crime against

Appellant argues that if we adopt this modern approach, we would have no choice but to conclude that a rational juror could not have found his moving Fisher approximately 200 feet to his truck sufficient restraint to support a kidnapping conviction, as it was only a "temporary confinement or slight movement which was part and parcel of an aggravated assault."

Nevertheless, Appellant recognizes that this is not the law in Texas and that the Texas Court of Criminal Appeals expressly rejected this approach in *Hines*, 75 S.W.3d at 446. There, the court started its analysis by observing that the Texas Penal Code does not define the term "interfere substantially" in the context of the kidnapping statute. *Id.* The court believed this was intentional on the state legislature's part and that it therefore "intended for jurors to follow and apply the plain language of the phrase as it appears in the text." *Id*. at 447 (citing *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (en banc)). Stated otherwise, the court held that a phrase such as "interfere substantially," which is in "common use[,] does not generally have such an involved, complicated meaning as to require a defining thereof." *Id*. (citing *Teer v. State*, 923 S.W.2d 11, 19 (Tex. Crim. App. 1996)). The court further recognized that there is nothing in the kidnapping statute requiring the State to "prove that a defendant moved his victim a certain distance, or that he held him a specific length of time" before a jury could find a "restraint" had taken place to support the substantial interference element of the offense. *Id*. at 447–48.

---

the victim." *See State v. Salamon*, 949 A.2d 1092, 1119 (Conn. 2008) (citing collecting cases). The court noted that although the various cases it cited involved "varying statutory language and analyses, they share a common theme, namely, that it is unlikely that the legislature intended to expose an accused to a kidnapping conviction, and the severe sanctions accompanying such a conviction, when the restraint involved is merely incidental to the commission of a separate, underlying crime." *Id*. The court characterized this view as the "modern" approach. *Id.* at 1119–20.

Finally, the court held "nothing in the statute indicat[es] that the Legislature intended to bar the prosecution of a kidnapping that is part and parcel of another offense." *Id.* at 448. And although the court recognized that the "Legislature did not intend for every crime which involves a victim whose liberty has been interfered with to turn into a kidnapping," it nevertheless held that it was "up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place[,] . . . by looking at all of the circumstances surrounding the offense." *Id*. Thus, it concluded that there is "no per se bar to a kidnapping prosecution for conduct that occurs during the commission of another offense." *Id*.

Applying this standard, the court in *Hines* held that there was legally sufficient evidence to support a kidnapping conviction, where the defendant and another man waited for a bank employee to open the bank doors, forced their way in, and threatened the employee by pointing a gun at her, leading her around by the neck until she turned off the alarm, then leading her to another room where they ordered her to open the bank vault. *Id*. at 448. The court rejected the defendant's argument that the abduction or restraint was only part and parcel of the bank robbery and concluded that a "rational juror could have found that [the employee] was abducted by [the defendant]," such as to support a separate kidnapping conviction. *Id*.

Appellant argues *Hines* was "wrongly decided," and the "unintended consequences" of the opinion are that "every crime involving a victim whose liberty has been slightly interfered with turns into a kidnapping." He claims this has "led to absurd results–consequences the legislature never intended." Nevertheless, Appellant correctly recognizes that *Hines* remains the "controlling" law in Texas. *See Griffin v. State*, 491 S.W.3d 771, 775 (Tex. Crim. App. 2016) (reaffirming its

13

holding in *Hines* that there is no requirement that a kidnapping victim be moved a specific distance or be restrained for a specific amount of time to uphold a kidnapping conviction); *Ritz v. State*, 533 S.W.3d 302, 308–09 (Tex. Crim. App. 2017) (recognizing that in *Hines*, the court held that the kidnapping statute "could be applied to temporary confinement or slight movement of the victim incidental to another substantive criminal offense"); *see also Valdez v. State*, No. 08-10-00331-CR, 2012 WL 4928905, at *8 (Tex. App.—El Paso Oct. 17, 2012, pet. ref'd) (recognizing that in accordance with *Hines*, it is "up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place").

Regardless of our opinion of the holding in *Hines*, we are bound to follow that holding. *See Contreras v. State*, 915 S.W.2d 510, 522 (Tex. App.—El Paso 1995, pet. ref'd) (recognizing that "[a]s an intermediate appellate court, we are duty bound to follow the law declared by the Texas Court of Criminal Appeals on matters pertaining to the enforcement of criminal laws"); *see also Sell v. State*, 488 S.W.3d 397, 399 (Tex. App.—Fort Worth 2016, pet. ref'd) (recognizing that an intermediate court is "bound to follow the decisions of the Court of Criminal Appeals"). Accordingly, we reject Appellant's invitation to disregard the holding in *Hines*, and we apply the standards set forth in *Hines* in resolving Appellant's sufficiency challenge.

Applying those standards, we agree with the State that there was legally sufficient evidence to support Appellant's conviction for aggravated kidnapping. Fisher testified at trial that Appellant forced him at gunpoint to move several feet, while making threats to kill him if he did not comply with Appellant's orders. Accordingly, a reasonable jury could have concluded that Appellant's

14

conduct "interfered substantially" with Appellant's liberty so as to satisfy the element of the offense.

As Appellant does not challenge any other element of the offense, we conclude that there was legally sufficient evidence to support Appellant's conviction for aggravated kidnapping.

Appellant's sole issue on appeal is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

LISA J. SOTO, Justice

August 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)